

RECEIVED
6/28/2021    LK
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUSTIN MAHWIKIZI,                                       :
                                                        :
    Plaintiff.                        :
                                                        :
                                                        :    **1:21-CV-03467**
v.                                                      :    Case No. _____
                                                        :
CENTERS FOR DISEASE CONTROL & PREVENTION,               :    Judge _____ JUDGE SHAH
                                                        :    MAGISTRATE JUDGE WEISMAN
DEPARTMENT OF HEALTH & HUMAN SERVICES,                  :    Magistrate Judge _____
                                                        :
JAY ROBERT PRITZKER, in his official capacity           :
as Governor of Illinois,                                :
                                                        :
ILLINOIS DEPARTMENT OF PUBLIC HEALTH,                   :
                                                        :
Defendants.                                             :


<u>VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

Plaintiff complains as follows:

I. STATEMENT OF THE CASE


    This is a First Amendment constitutional challenge to provisions of the Federal Transportation Mask Mandate ("FTMM") as it applies in the State of Illinois and for Rideshare Drivers and Riders. (Exhibit 1)

    Plaintiff JUSTIN MAHWIKIZI brings this suit to permanently enjoin enforcement of the Federal Transportation Mask Mandate ("FTMM") put into place by orders of Defendants Centers for Disease Control & Prevention ("CDC"), Department of Health & Human Services ("HHS"), nationally, in addition to Illinois Governor Jay Robert Pritzker, and the Illinois Department of Public Health, in Illinois.


    This lawsuit appears to be the third in the nation to challenge aspects of the FTMM. Searches of Ballotpedia's database of 999 "lawsuits about state actions and policies in response to the coronavirus (COVID-19) pandemic, 2020-2021" revealed two lawsuits; Lucas Wall vs. CDC Et. al. and Corbett v. TSA.

The Court should hold the FTMM as an unconstitutional exercise of executive authority. The FTMM exceeds CDC's statutory authority because § 361 of the Public Health Service Act contains no authority to adopt a nationwide mask mandate for the transportation (or any other) sector. Congress never intended for the Executive Branch to have the authority to promulgate these polices and even if it did, they are unconstitutional.

Congress has enacted at least 20 laws directly concerning the coronavirus pandemic, yet none of these have authorized a mask mandate. The Federal Defendants may not exercise their authority in a manner that is inconsistent with the administrative structure that Congress enacted.

The FTMM is arbitrary, irrational, and capricious because the Federal Defendants failed to reasonably explain why other measures are insufficient to tackle the rapidly declining COVID-19 infection and death rates.

Finally, the FTMM raise constitutional questions including 1st amendment violations of freedom of religious exercise, and freedom of speech, among others. If Section 361 of the Public Health Service Act confers such broad authority upon Defendant CDC to adopt these policies, the statute would violate the nondelegation doctrine because it contains no intelligible principle guiding CDC's exercise of its authority. The FTMM is also unconstitutional because they effectuate a taking of private property (transportation services paid for) without just compensation and delegate enforcement and exemption decisionmaking to nonfederal entities.

In Illinois, Governor Pritzker and the Illinois Department of Public Health forced businesses to deny service to customers who did not have a mask on with a threat of a fine. The IDPH emergency rules were only repealed when members of the IL Legislature who were also members of the Joint Committee on Administrative Rules (JCAR) indicated they would not have enough votes to renew the IDPH emergency rules in May 2021. This followed after a Circuit Court in Cook County acknowledged that the

IDPH mask mandate was violating the 1st amendment freedom of religious exercise in MAHWIKIZI Vs. IDPH (Case No. 2021CH01272).

Following Governor Pritzker repeal of the IDPH mask mandate; the Pritzker Administration still enforced the CDC FTMM that covers mask mandates in transportation including Ridershare Services.   Essentially; IDPH mask mandate was repealed following an acknowledgment of a Circuit Court Judge that the IDPH mask mandate violated Rideshare Drivers' freedom of religious exercise; however The State of IL would continue to enforce the CDC's FTMM that still violates Rideshare Drivers' freedom of religions exercise.

It is under the guise of this redundancy and continued Constitutional violations that MAHWIKIZI brings a Federal case against the Federal Defendants in addition to State claims against Governor Pritzker and the Illinois Department of Public Health.  Transportation businesses are no longer under a mask mandate by the State under threat of a fines; however these same Transportation businesses are under a Federal Mask Mandate under threat of a fine or possible imprisonment.

It is therefore appropriate for a Federal Court to address the discrepancies, and continued U.S. Constitution violations that are still imposed on Transportation businesses by the Federal Government in light of the CDC's confusing announcement that unvaccinated people are free to do what they want, but unvaccinated people are still held under the restrictive activity bans including mask wearing.  The CDC is effectively saying that Vaccine induced antibodies is superior to natural immunity induced antibodies. The translation is that communities who have been more welcoming to take the vaccine are superior to communities who have viewed the vaccine with less candor, and who have preferred to go through the natural immunity path.  If we peel the onion further; We will find communities who have had crimes committed against them by the CDC in the past will be of a particular race.  CDC is therefore saying that these communities who do not have any trust in the CDC will be punished for not trusting the CDC and will remain under heavy restrictions.

This has birthed another push by Governor Pritzker to induce Illinois businesses to require proof of vaccinations or VAX Passports of their customers or refuse service. The political climate has forced Governor Pritzker to distance himself from his earlier calls for vaccine passports due to a new moniker quickly becoming more popular for him as "Illinois' Segregationist in Chief".

Businesses that had followed Governor Pritzker's inducement to institute segregationist policies of checking proof of vaccination before entry including the Illinois Union League Club, Speedway Gas Sations, 7-Eleven, The Cubs baseball organization, and more.

However Governor Pritzker's continued enforcement of CDC's FTMM order still requires even vaccinated people to wear masks in transportation settings such as flights, airports, trains, trainstations, and rideshare rides. It requires Rideshare drivers, flight attendants, and train conductors to refuse service to people in need even if they are 3 years old and cannot keep a mask on.

In Rideshare rides, the windows are open, and the ride has the full effect of being outdoors walking on the street. Yet; in Illinois, The mask up mandate continues for Rideshare rides. Drivers are forced to refuse service to those who do not mask regardless of the reason. the CDC FTMM promulgated in Illinois by Governor Pritzker in his latest emergency order 2021-14 (Exhibit 2) and thereafter enforced by the Illinois Department of Public Health violate MAHWIKIZI's 1st amendment right to freedom of speech and freedom of religious exercise. It also violates riders' 9th amendment that says that "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people".

MAHWIKIZI maintains and reasserts the United States Constitution crafters wisdom in enacting the 9th Amendment. Rideshare Riders have a 9th Amendment right to choose whether they want to breathe freely or wear a mask during their Rideshare Rides. In fact, a parent has a 9th Amendment right to decide if their 4 year old should wear a mask in 90 degree weather or not. The CDC deprives American residents of this 9th Amendment right. It is doubtful that the CDC can competently convince this court

that the 9th Amendment right does not apply to American residents who they allow to not wear a mask indoor and outdoor but require they wear a mask in a Rideshare ride with windows open whether they have immunity from Covid-19 through natural Immunity (God's gift to mankind", or through artificially induced Immunity via one of the myriad of Vaccines available on the market.   In Fact, The CDC has already published on their website (Exhibit 3) that Vaccine Immunity and Natural Immunity are all equal and both are considered by the CDC to be called "Active Immunity".   However, their policies go against what the CDC has advocated for decades.

## II. PARTIES

Plaintiff MAHWIKIZI resides in Illinois' Cook County.

Defendant Centers for Disease Control & Prevention is an agency of HHS. It is headquartered at 1600 Clifton Rd., Atlanta, GA 30329. It has offices in Illinois

Defendant Department of Health & Human Services is a department of the Executive Branch. It is headquartered at 200 Independence Avenue, SW, Washington, DC 20201. CDC is a department of HHS.

Defendant Jay Robert Pritzker is Governor of Illinois with offices in Springfield, IL & Chicago IL.

Defendant Illinois Department of Public Health is a department of the Illinois Executive Branch. It has offices in Chicago IL, and Springfield IL

III. BASIS FOR JURISDICTION, VENUE, & STANDING

This Court has jurisdiction over this case under 28 U.S.C. § 1331: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." MAHWIKIZI's claims arise under federal law, specifically the APA (5 U.S.C. § 702 et. seq.), as well as the U.S. Constitution and the Code of Federal Regulations. MAHWIKIZI also includes a state claim against Governor Pritzker and Illinois Department of Public Health since they are directly related to federal enforcement of the FTMM.

This Court has the authority to grant declaratory relief and to vacate the FTMM under the Declaratory Judgment Act, the APA, and this Court's inherent equitable powers. 28 U.S.C. §§ 2201, 2202; 5 U.S.C. §§ 702, 706.

Venue is proper in this judicial district because a substantial part of the events giving rise to this lawsuit occurred in Chicago, Illinois & Cook County, IL. "A civil action may be brought in … a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred …" 28 U.S.C. § 1391(b)(2). Also "A civil action in which a defendant is … an agency of the United States … may, except as otherwise provided by law, be brought in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred …" 28 U.S.C. § 1391(e)(1).

MAHWIKIZI has standing to sue the defendants because the FTMM restricts his freedom of speech & freedom to practice his religion, and constitute an illegal taking of his property (transportation services purchased). A court order declaring unconstitutional and setting aside the FTMM would redress MAHWIKIZI's injuries because MAHWIKIZI's 1st amendment rights guaranteed by the United States Constitution would be restored. As of now, MAHWIKIZI is required to refuse service to those in need who happen to not have a mask on because of the FTMM, depriving MAHWIKIZI of 1st amendment constitutional rights.

IV. STATEMENT OF FACTS

1.  With effective Date of February 1, 2021, and signed on January 29th, 2021 by Martin Cetron of the CDC; the FTMM Order orders Rideshare Drivers to require riders wear a mask or refuse service with total discrimination unless the rider is 2 years old or younger.

2.  MAHWIKIZI is a citizen and lawful resident of Cook County, Illinois.

3.  MAHWIKIZI provides Transportation Services

4.  MAHWIKIZI practices the religion of Christianity observing the doctrine of the Catholic Church

5.  MAHWIKIZI has observed many of the sacraments required of his religion; including Baptism, Communion(Eucharist), Confirmation, Reconciliation, and Marriage.

6.  MAHWIKIZI in practicing his religion; observes the teachings of Jesus Christ of Nazareth, especially the "Good Samaritan Principle".

7.  For those who may not be familiar with Jesus Christ's teachings, the Parable of the Good Samaritan can be found in Luke 10:25-37:

    a.  25 On one occasion an expert in the law stood up to test Jesus. "Teacher," he asked, "what must I do to inherit eternal life?"

    b.  26 "What is written in the Law?" he replied. "How do you read it?

    c.  27 He answered, "'Love the Lord your God with all your heart and with all your soul and with all your strength and with all your mind'[a]; and, 'Love your neighbor as yourself.'[b]"

    d.  28 "You have answered correctly," Jesus replied. "Do this and you will live."

e. But he wanted to justify himself, so he asked Jesus, "And who is my neighbor?"

f. 30 In reply Jesus said: "A man was going down from Jerusalem to Jericho, when he was attacked by robbers. They stripped him of his clothes, beat him and went away, leaving him half dead.

g. 31 A priest happened to be going down the same road, and when he saw the man, he passed by on the other side.

h. 32 So too, a Levite, when he came to the place and saw him, passed by on the other side.

i. 33 But a Samaritan, as he traveled, came where the man was; and when he saw him, took pity on him.

j. 34 He went to him and bandaged his wounds, pouring on oil and wine. Then he put the man on his own donkey, brought him to an inn and took care of him.

k. 35 The next day he took out two denarii[c] and gave them to the innkeeper. 'Look after him,' he said, 'and when I return, I will reimburse you for any extra expense you may have.'

l. 36 "Which of these three do you think was a neighbor to the man who fell into the hands of robbers?"

m. 37 The expert in the law replied, "The one who had mercy on him." Jesus told him, "Go and do likewise."

8. The Jan 29th, 2021 CDC FTMM Orders, inter alia, limits MAHWIKIZI's constitutionally protected freedoms to practice his religion (1st Amendment of the U.S. Constitution), and his freedom of speech (1st Amendment of the U.S. Constitution) Where MAHWIKIZI is refused his Constitutional free agency to accept or deny service to clients. CDC FTMM requires him to refuse service to those in need without the opportunity to accept the same service to those in need. The acceptance of service is a form of free speech. The rider's request for transportation services is accepted by MAHWIKIZI or refused by MAHWIKIZI. An order requiring MAHWIKIZI refuse service and prevents an opportunity for MAHWIKIZI to accept the same service request

denies him of speech. Therefore CDC's FTMM denied MAHWIKIZI of his 1st amendment to free speech in that he is no longer allowed to accept a request for transportation services to someone who may not have a mask on.

9.  MAHWIKIZI's right to practice of his religion as it pertains to the "Good Samaritan Principle" is violated by the CDC's FTMM which force him to act contrary to the teachings of Jesus Christ.

10. The CDC FTMM rules forbids anyone from being a good Samaritan and forces MAHWIKIZI to leave a mother with her children on the side of the road because one of her children does not have a mask on or cannot keep one on.

11. The CDC FTMM rules require for MAHWIKIZI to leave a person who is physically hurt and looking to go get his/her wound looked at on the side of the road if they happen to not have a mask on.

12. THE CDC FTMM Rules would forbid the Good Samaritan from tending the the injured man because he was without clothes like they forbid MAHWIKIZI from taking on a client who does not have a mask on regardless of the reasons why they do not have a mask on.

13. On or about March 5th, 2021; MAHWIKIZI was faced with a situation where he was required by the FTMM to refuse service to a mother whose children were not wearing masks and were above the age of 2. This would have resulted in the mother and children being left on the side of the road in the middle of Chicago's winter in a dangerous neighborhood.

14. On or account March 19th, 2021 - MAHWIKIZI filed a constitutional claim in Cook County Circuit Court against IDPH (Case No. 2021CH01272) claiming a violation of his Constitutional 1st Amendment rights.

15. On April 30th, 2021 - Oral arguments took place in MAHWIKIZI Vs. IDPH where MAHWIKIZI Successfully argued that IDPH's mask mandate forcing businesses to deny service to those in need was a violation of MAHWIKIZI's 1st Amendment Constitutional rights. (Exhibit 4)

16. On May 14, 2021; Judge Eve Reilly of the Cook County Circuit Court, in MAHWIKIZI Vs. IDPH recognized in writing that MAHWIKIZI had an ascertainable right of Freedom to Practice Religion that had been violated by the now repealed IDPH Mask Mandate for Illinois businesses.

17. On or about May 17, 2021; The CDC announced that Vaccinated people would no longer need to wear a mask in indoor or outdoor settings.

18. On or about May 26th, 2021; MAHWIKIZI picked up a masked rider who happened to be a minor (16-17 years old), who will be referred as Mr. K, and who had a destination of a mall in Lansing IL. MAHWIKIZI's vehicle was stopped by an unmarked police car. As documented in MAHWIKIZI's letter to the Police department chief of the police officers who stopped MAHWIKIZI's Vehicle (Exhibit 5); The police officers attested that they stopped MAHWIKIZI's vehicle on the sole basis of the type of mask the rider, Mr. K, was wearing. The Police officers used this pretext to stop MAHWIKIZI's vehicle. Additionally, as indicated in the letter, The police officers entered MAHWIKIZI's car on the rear passenger side to search Mr. K for weapons. The mask worn by Mr. K was the probable cause used by the Police officers to stop MAHWIKIZI's car, and enter MAHWIKIZI's car to manually feel around Mr. K's waist. Mr. K is a minor. The police officers did not ask for permission to open MAHWIKIZI's car and conduct a search of Mr. K. The police officers did not ask Mr. K to step outside the car. The police officers traumatized a minor going to the mall while saying the type of mask Mr. K wore looked like he was going to rob MAHWIKIZI or a store at the mall. Mr. told the officers that he was wearing the same mask that his school allowed. Many constitutional rights were broken including both Mr. K's & MAHWIKIZI constitutional amendment rights against unlawful searches. As indicated in MAHWIKIZI's letter to the Police Department Chief of the police officers; MAHWIKIZI understands that the use of

Masks as a probable cause was induced by the CDC FTMM order which Governor Pritzker and IDPH enforced in ILLINOIS.  MAHWIKIZI asked the Police Department Chief in his letter to have a conversation with their officers about FTMM and what is allowed and not allowed in the field.

19. On May 27th, 2021, MAHWIKIZI filed a Freedom of Information Act Request (Case Number 21-01357-FOIA) also found in (Exhibit 6); with the CDC seeking any information that the CDC has that supports:

    a. "Please provide any mention, publication, study, email, text, declaration by the CDC that shows that for Covid19; Active immunity from natural antibodies by direct infection is inferior to Vaccine induced antibodies from Pfizer, Moderna, JNJ, other Emergency Use approved vaccines. Please provide any study that shows that people with natural immunity have to keep wearing masks versus people with vaccine induced antibodies."

20. To date, the CDC has failed to answer to MAHWIKIZI's FOIA request.

21. This was not the first time we see businesses and business owners being forced by Executive, and legislative branches to refuse service to customers. The worst example was the early 1900s Jim Crow Laws that fined businesses if they let Black customers eat at their restaurants; rent from their rental properties; or even drink from a "white Only" water fountain. Health was also used to convince the white population that their black neighbors were dangerous to them.

22. History revisionists try to make that situation into a purely white supremacist problem and "all white people are racist" narrative. However; at first, the Business owners who

refused service to Black customers were doing it according to local laws and rules propagated by Executive branch agencies and Legislative branch statutes. Some of these actions were made under the guise of "public health" following the 1918 Flu Pandemic. Similar to IL businesses forced by IDPH mask mandate to refuse service to those who don't have masks on.  Hate is taught, and conditioned on others by those in power.

23. Historian C. Van Woodward pointed out in a 1946 article (EXHIBIT 7) that Black Americans and White Americans mixed relatively freely until the 1880s, when State Government and Legislatures passed the 1st laws requiring Railroad providers separate regular train cars from "Negro" or "Colored Passengers'.

24. These laws led to Plessy V. Ferguson in 1896 where Judge John H. Ferguson proclaimed that "Separate But Equal" implies merely a legal distinction between White Americans and Black Americans and was not Unconstitutional.   A Judicial error that would become a predicate behind untold deaths, persecutions, and massacres.

25. The Plessy decision was relied upon in advocating and sponsoring segregation; All Jim Crow laws were built on Plessy. All Jim Crow rules & laws were built on a Judicial branch action to validate discrimination and segregation of American residents.  A stain on this Country's history.   A collective trauma that we still feel to this day despite Judicial advancements such as Supreme Court appointments like Thurgood Marshall, the last century's civil rights giant.   Jim Crow was a Judicial mistake and error that the Judicial branch is still trying to rectify to this date.

26. CDC's FTMM does just that once again, forgetting the history of this country. The rules require Transportation Business owners, and their employees, to refuse service to customers in the name of public health. The last time this was instituted was during the Jim Crow Laws.

27. That CDC requires transportation businesses to be safe and maintain a clean environment is not what is at issue. What is at issue is that CDC requires refusal of service, also known as discrimination, against their customers without solid scientific foundation.   The Opposite is being proven by institutions like the Cleveland Clinic (Exhibit 8) while the CDC still has not answered to MAHWIKIZI's FOIA request to show that Vaccine Induced Immunity is superior to Natural Induced Immunity.

28. That CDC still has not answered MAHWIKIZI's Freedom of Information Act request to show how natural immunity is inferior to Vaccine induced immunity shows a lack of scientific foundation behind CDC's FTMM order that is inducing the violation of people's constitutional rights in that it asks vaccinated people to still wear a mask in transportation settings. Vaccinated people have vaccine induced immunity. CDC also asks those with natural immunity through natural infection to also still wear a mask in transportation sectors. The wearing of a mask is no longer rooted in scientific foundation. Forcing the abandonment of the United States Constitution; even in a pandemic, is not grounds that the United Supreme Court will abide by. The CDC's FTMM, and vaccine segregation tendencies are inducing a renewed Segregation of America under their authority. As the U.S. Supreme Court Emergency opinion in Catholic Diocese of Brooklyn NY Vs. Cuomo said: "Even in a pandemic, the Constitution cannot be put away and forgotten."

29. To establish a clearly ascertainable right in need of protection, a plaintiff must raise a fair question that She/He has a substantive interest recognized by statute or common law. A well-pleaded complaint for injunctive relief must contain on its face a clear right to relief and allege facts which establish the right to such relief in a positive, certain and precise manner.

30. Here, MAHWIKIZI alleges an ascertainable right in his free exercise of religion. MAHWIKIZI alleges that his religion mandates that he helps those in need, and that this belief extends to individuals who request rideshare services whether they are masked or

not. MAHWIKIZI has an ascertainable right to free exercise of his religion in addition to an ascertainable right to freedom of speech in deciding what rides to accept or deny.

31. We have clear U.S. Supreme Court decisions that show where the current U.S. Supreme Court may stand in MAHWIKIZI's complaint.

32. In Braunfeld Vs. Brown where Braunfeld complained against the state of Pennsylvania making a law forbidding the sale of retail products on Sundays because the suspect class impacted was the orthodox Jewish community that closed their businesses on Saturday to observe the Sabbath.

33. The U.S. Supreme Court decision in Braunfeld; the Court held that "Where the purpose or effect of a law is to impede the observance of one or all religions or is to discriminate invidiously between religions, that law is constitutionally invalid even though the burden may be characterized as being only indirect.

34. Justice Brennan agreed that the State cannot put an individual to a choice between his business and his religion.   This became the basis 2 years later in Justice Brennan's majority opinion in Sherbet Vs. Verner - Striking a law down that prohibited a worker from collecting unemployment because said worker did not work Saturdays due to their religion.

35. Here too, the Federal Defendants are asking MAHWIKIZI to choose between his work and his religion.

36. The suspect class in the FTMM is Christian employees or business owners. They are forced to choose between Jesus Christ's teachings in the Good Samaritan Parable and their work.  It is as if in Braunfeld V. Brown; the State of Pennsylvania made a law instead to require all businesses to be open on Saturdays.  The clear suspect class would be the Orthodox Jewish community and other religions that observe the Sabbath.  In CDC's FTMM, the suspect class are Christians that observe Jesus Christ's teachings in the Good Samaritan Principle.

37. With increasing studies showing that natural immunity is prevalent in addition to the availability of vaccines for the most vulnerable populations against Covid-19, in addition to successful therapeutics that have lowered serious illness and death; the CDC FTMM is arbitrary, irrational, and obsolete.

38. Under Smith (Employment Division V. Smith) - Government no longer had to show that it was acting in furtherance of a "compelling public interest" if burden was an unintended result of laws that are generally applicable **unless**:

    1. The laws intended to prohibit the free exercise of religion,

    2. The laws violated other 1st amendment constitutional rights

39. MAHWIKIZI has shown that the CDC FTMM violates MAHWIKIZI's free exercise of religion and MAHWIKIZI's freedom of speech in their mandate to refuse service to all riders who may not be wearing a mask during rideshare services.

40. Federal Defendants will argue that rather than being held under the Strict Scrutiny Test; they should be held on the rational basis Test.  MAHWIKIZI argues against such a notion; and even if the Court allowed the rational basis test; MAHWIKIZI will submit a request for documents at the evidentiary stage that will show that the CDC's FTMM is irrational and obsolete.

41. MAHWIKIZI continues to suffer irreparable harm from the CDC's FTMM.

42. In a recent U.S. Supreme Court opinion in Roman Catholic Diocese of Brooklyn NY Vs. Governor Andrew Cuomo of NY; The Supreme Court again assumed a broad understanding of religious freedom in the Constitution citing a precedent that holds that the loss of 1st Amendment freedoms, for even minimal period of time, unquestionably constitutes irreparable injury - Elrod V. Burns.

43. The Supreme Court in the same case held that granting injunctive relief would not harm the public.  "Even in a pandemic, the Constitution cannot be put away and forgotten."

44. CDC FTMM is not a neutral law of general application that results only in incidental effect on 1st amendment rights.   For Rideshare Drivers like MAHWIKIZI who are observing Christians, the effect of the FTMM is continuous daily for every ride request they have to refuse without the legal opportunity to accept.  This occurs over 15 times a day for MAHWIKIZI, over 80% of MAHWIKIZI's clients.

45. In fact, as in Nashville, Chattanooga & St. Louis Railway Vs. Waters [294 U.S. 405(1935)] - The U.S. Supreme Court even reversed a decision of the Tennessee Supreme Court on the grounds that a person should have the chance to prove that a law that once may have been rational had become obsolete and irrational.

46. MAHWIKIZI has established two first amendment ascertainable rights in need of protection

47. MAHWIKIZI has established a likelihood of success on merits whereby the Court will hold Federal Defendants to the high threshold of Strict Scrutiny Test

48. MAHWIKIZI has established an irreparable harm in the absence of inductive relief highly relying on the U.S. Supreme Court recent opinion in Catholic Brooklyn V. Cuomo

49. MAHWIKIZI has shown a lack of adequate remedy at law

50. MAHWIKIZI has shown that he benefits of an injunction outweigh possible injury to the State.

51. An actual controversy exists between the parties in regard to the CDC FTMM when it comes to the practice of religion, and freedom of speech.

52. An actual controversy exists between the parties in regard to the authority of Pritzker, and IDPH to issue and enforce face coverings/masks to all Illinois residents using transportation.

53. An immediate and definitive determination is necessary to clarify the rights and interests of the parties.

## COUNT I

### REQUEST FOR DECLARATORY JUDGEMENT

THEREFORE, Plaintiff, JUSTIN MAHWIKIZI, herein request that this court enter an Order:

A. MAHWIKIZI restates paragraphs 1-54 as if more fully stated herein.

B. Entering an order finding CDC's FTMM Order were declared January 29th, 2021;

C. Entering an order finding the FTMM Order actioned by CDC violate the 1st Amendment constitutional rights of MAHWIKIZI when it comes to his practice of his Religion, and Freedom of Speech;

D. Entering an order finding the FTMM Order actioned by CDC violate the public's 9h Amendment when it comes to requiring vaccinated people or those with natural immunity to continue to mask up in transportation settings.;

E. That the Court grant such other and further relief as is just and proper.

5

## COUNT II

### REQUEST FOR INJUNCTION

A.  MAHWIKIZI restates paragraphs 1-54 as if more fully stated herein.

B.  MAHWIKIZI is being irreparably harmed each and every day beyond August 07, 2020 in which he continues to be subjected to CDC's ultra vires FTMM order through its' implementation by Governor Pritzker, and IDPH specifically to force MAHWIKIZI's clients to wear a mask or ask them to leave his vehicle or simply leave them by the side of the road.

C.  MAHWIKIZI has no adequate remedy at law to prohibit CDC, and downstream State Agencies from enforcing the FTMM order against him absent an injunction from this Court ordering the same.

D.  There is a reasonably likelihood of success on the merits in that CDC's FTMM order violate MAHWIKIZI's Constitutional 1st Amendment rights that forces MAHWIKIZI to require MAHWIKIZI's clients to wear a mask or ask them to leave his vehicle or simply leave them by the side of the road. Both Practice of Religion, and Freedom of Speech.

WHEREFORE, Plaintiff, JUSTIN MAHWIKIZI, prays that this Court enters a declaratory and injunctive judgement in his favor and finds and declares that:

B. Finding MAHWIKIZI is irreparably harmed each day he is subjected to the CDC FTMM relative to this cause, specifically requiring MAHWIKIZI to require MAHWIKIZI's clients to wear a mask or ask them to leave his vehicle or simply leave them by the side of the road.

C. Finding MAHWIKIZI has no adequate remedy at law to protect his rights against any unconstitutional orders of HHS, CDC, IDPH and the Pritzker Administration beyond injunctive relief.

D. Finding MAHWIKIZI has a likelihood of success on the merits, and has clearly stated ascertainable rights in need of relief

E. Enter an injunction permanently enjoining HHS, CDC, or anyone the under the Agencies' authorities, from enforcing the CDC FTMM against MAHWIKIZI from this date forward.

F. For such other relief as this Court deems just and proper.

Respectfully submitted,

/S/JUSTIN MAHWIKIZI
JUSTIN MAHWIKIZI
18430 Francisco Avenue
Homewood IL, 60430

CERTIFICATION

Under F.R.Civ.P. 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Respectfully submitted this 28th day of June 2021.

Date: 6/28/2021     By: _____

/S/JUSTINMAHWIKIZI

JUSTIN MAHWIKIZI

## CERTIFICATE OF SERVICE

In addition to formal service of process, due to the emergency nature of this action, JUSTIN MAHWIKIZI hereby certifies that on June 28, 2021, MAHWIKIZI e-mailed this Complaint and all accompanying exhibits and documents to the Defendants' counsels:

Eric Beckenhauer, Leslie Vigen, and Steven Myers
Civil Division, Federal Programs Branch
U.S. Department of Justice
eric.beckenhauer@usdoj.gov, leslie.vigen@usdoj.gov, and steven.a.myers@usdoj.gov

Danny Tenny and Jennifer Utrecht
Civil Division, Appellate Staff
U.S. Department of Justice
jennifer.l.utrecht@usdoj.gov and daniel.tenny@usdoj.gov

John R. Lausch
U.S. Attorney for the Northern District of Illinois, Eastern Division
U.S. Department of Justice
john.Lausch@usdoj.gov

### HHS - Counsels
tracey.mullins@hhs.gov
buddy.frye@hhs.gov
sean.keveney@hhs.gov
barbara.mcgarey@hhs.gov
paul.rodriguez@hhs.gov
lisa.barclay@hhs.gov
daniel.barry@hhs.gov
aaron.schuham@hhs.gov
audrey.wiggins@hhs.gov
julia.pierce@hhs.gov

### CDC - Counsels
dtress@cdc.gov
lyueh@cdc.gov

### Illinois Department of Public Health - Counsels
snigdha.archarya@illinois.gov
jason.boltz@illinois.gov
justin.dewitt@illinois.gov
tamora.harter@illinois.gov

### Governor Pritzker - Counsels
gretchen.Helfrich@illinois.gov
christopher.Wells@illinois.gov

/S/JUSTIN MAHWIKIZI
JUSTIN MAHWIKIZI

# <u>EXHIBITS</u>

1. CDC FTMM ORDER

2. JUNE 25 EXECUTIVE ORDER BY GOVERNOR PRITZKER

3. CDC'S WEBSITE POST ON ACTIVE IMMUNITY (VACCINE/NATURAL)

4. MAHWIKIZI V. IDPH 4/30/21 ORAL ARGUMENT TRANSCRIPT

5. MAHWIKIZI LETTER TO POLICE STATION CHIEF AFTER MASK RELATED TRAFFIC STOP

6. MAHWIKIZI FOIA REQUEST TO THE CDC

7. C. VAN WOODWARD ARTICLE ON PRE-JIM CRAW LIFE IN THE U.S.A.

8. CLEVELAND CLINIC STUDY ON NATURAL IMMUNITY

# EXHIBIT (1)

**CENTERS FOR DISEASE CONTROL AND PREVENTION**
**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**ORDER UNDER SECTION 361**
**OF THE PUBLIC HEALTH SERVICE ACT (42 U.S.C. 264)**
**AND 42 CODE OF FEDERAL REGULATIONS 70.2, 71.31(b), 71.32(b)**

**REQUIREMENT FOR PERSONS TO WEAR MASKS**
**WHILE ON CONVEYANCES AND AT TRANSPORTATION HUBS**

SUMMARY:

Notice and Order; and subject to the limitations under "Applicability," pursuant to 42 U.S.C. 264(a) and 42 CFR 70.2, 71.31(b), and 71.32(b):

(1) Persons[1] must wear[2] masks over the mouth and nose when traveling on conveyances into and within the United States. Persons must also wear masks at transportation hubs as defined in this Order.

(2) A conveyance operator transporting persons into and within the United States[3] must require all persons onboard to wear masks for the duration of travel.

(3) A conveyance operators operating a conveyance arriving at or departing from a U.S. port of entry must require all persons on board to wear masks for the duration of travel as a condition of controlled free pratique.[4]

(4) Conveyance operators must use best efforts to ensure that any person on the conveyance wears a mask when boarding, disembarking, and for the duration of travel. Best efforts include:

- boarding only those persons who wear masks;
- instructing persons that Federal law requires wearing a mask on the conveyance and failure to comply constitutes a violation of Federal law;
- monitoring persons onboard the conveyance for anyone who is not wearing a mask and seeking compliance from such persons;
- at the earliest opportunity, disembarking any person who refuses to comply; and
- providing persons with prominent and adequate notice to facilitate awareness and compliance of the requirement of this Order to wear a mask; best practices may include, if feasible, advance notifications on digital platforms, such as on apps, websites, or email;

---

[1] As used in this Order, "persons" includes travelers (*i.e.*, passengers and crew), conveyance operators, and any workers or service providers in the transportation hub.

[2] To "wear a mask" means to wear a mask over the nose and mouth.

[3] This includes international, interstate, or intrastate waterways, subject to the jurisdiction of the United States.

[4] As a condition of this controlled free pratique to commence or continue operations in the United States, conveyance operators must additionally require all persons to wear masks on board conveyances departing from the United States and for the duration of their travel until the conveyance arrives at the foreign destination if at any time any of the persons on the conveyance (passengers, crew, or conveyance operators) will return to the United States while this Order remains in effect. This precaution must be followed regardless of scheduled itinerary.

posted signage in multiple languages with illustrations; printing the requirement on transit tickets; or other methods as appropriate.

(5) Operators of transportation hubs must use best efforts to ensure that any person entering or on the premises of the transportation hub wears a mask. Best efforts include:

- allowing entry only to those persons who wear masks;
- instructing persons that Federal law requires wearing a mask in the transportation hub and failure to comply constitutes a violation of Federal law;
- monitoring persons on the premises of the transportation hub for anyone who is not wearing a mask and seeking compliance from such persons;
- at the earliest opportunity, removing any person who refuses to comply from the premises of the transportation hub; and
- providing persons with prominent and adequate notice to facilitate awareness and compliance with the requirement of this Order to wear a mask; best practices may include, if feasible, advance notifications on digital platforms, such as on apps, websites, or email; posted signage in multiple languages with illustrations; printing the requirement on transit tickets; or other methods as appropriate.


DEFINITIONS:

*Controlled free pratique* shall have the same definition as under 42 CFR 71.1, meaning "permission for a carrier to enter a U.S. port, disembark, and begin operation under certain stipulated conditions."

*Conveyance* shall have the same definition as under 42 CFR 70.1, meaning "an aircraft, train, road vehicle,[5] vessel . . . or other means of transport, including military." Included in the definition of "conveyance" is the term "carrier" which under 42 CFR 71.1 has the same definition as conveyance under 42 CFR 70.1.

*Conveyance operator* means an individual operating a conveyance and an individual or organization causing or authorizing the operation of a conveyance.

*Mask* means a material covering the nose and mouth of the wearer, excluding face shields.[6]

*Interstate traffic* shall have the same definition as under 42 CFR 70.1, meaning

---

[5] This includes rideshares meaning arrangements where passengers travel in a privately owned road vehicle driven by its owner in connection with a fee or service.

[6] A properly worn mask completely covers the nose and mouth of the wearer. A mask should be secured to the head, including with ties or ear loops. A mask should fit snugly but comfortably against the side of the face. Masks do not include face shields. Masks can be either manufactured or homemade and should be a solid piece of material without slits, exhalation valves, or punctures. Medical masks and N-95 respirators fulfill the requirements of this Order. CDC guidance for attributes of acceptable masks in the context of this Order is available at: https://www.cdc.gov/quarantine/masks/mask-travel-guidance.html

"(1):

    (i) The movement of any conveyance or the transportation of persons or property, including any portion of such movement or transportation that is entirely within a state or possession–

    (ii) From a point of origin in any state or possession to a point of destination in any other state or possession; or

    (iii) Between a point of origin and a point of destination in the same state or possession but through any other state, possession, or contiguous foreign country.

(2) Interstate traffic does not include the following:

    (i) The movement of any conveyance which is solely for the purpose of unloading persons or property transported from a foreign country or loading persons or property for transportation to a foreign country.

    (ii) The movement of any conveyance which is solely for the purpose of effecting its repair, reconstruction, rehabilitation, or storage."

*Intrastate traffic* means the movement of any conveyance or the transportation or movement of persons occurring solely within the boundaries of a state or territory, or on tribal land.

*Possession* shall have the same definition as under 42 CFR 70.1 and 71.1, meaning a "U.S. territory."

*State* shall have the same definition as under 42 CFR 70.1, meaning "any of the 50 states, plus the District of Columbia."

*Territory* shall have the same definition as "U.S. territory" under 42 CFR 70.1 and 71.1, meaning "any territory (also known as possessions) of the United States, including American Samoa, Guam, the [Commonwealth of the] Northern Mariana Islands, the Commonwealth of Puerto Rico, and the U.S. Virgin Islands."

*Transportation hub* means any airport, bus terminal, marina, seaport or other port, subway station, terminal (including any fixed facility at which passengers are picked-up or discharged), train station, U.S. port of entry, or any other location that provides transportation subject to the jurisdiction of the United States.

*Transportation hub operator* means an individual operating a transportation hub and an individual or organization causing or authorizing the operation of a transportation hub.

*U.S. port* shall have the same definition as under 42 CFR 71.1, meaning any "seaport, airport, or border crossing point under the control of the United States."


STATEMENT OF INTENT:

This Order shall be interpreted and implemented in a manner as to achieve the following objectives:

- Preservation of human life;
- Maintaining a safe and secure operating transportation system;
- Mitigating the further introduction, transmission, and spread of COVID-19 into the United States and from one state or territory into any other state or territory; and
- Supporting response efforts to COVID-19 at the Federal, state, local, territorial, and tribal levels.

APPLICABILITY:

This Order shall not apply within any state, locality, territory, or area under the jurisdiction of a Tribe that (1) requires a person to wear a mask on conveyances; (2) requires a person to wear a mask at transportation hubs; and (3) requires conveyances to transport only persons wearing masks. Such requirements must provide the same level of public health protection as — or greater protection than —the requirements listed herein.

In addition, the requirement to wear a mask shall not apply under the following circumstances:

- While eating, drinking, or taking medication, for brief periods;
- While communicating with a person who is hearing impaired when the ability to see the mouth is essential for communication;
- If, on an aircraft, wearing of oxygen masks is needed because of loss of cabin pressure or other event affecting aircraft ventilation;
- If unconscious (for reasons other than sleeping), incapacitated, unable to be awakened, or otherwise unable to remove the mask without assistance;[7] or
- When necessary to temporarily remove the mask to verify one's identity such as during Transportation Security Administration screening or when asked to do so by the ticket or gate agent or any law enforcement official.

This Order exempts the following categories of persons:[8]

---

[7] Persons who are experiencing difficulty breathing or shortness of breath or are feeling winded may remove the mask temporarily until able to resume normal breathing with the mask. Persons who are vomiting should remove the mask until vomiting ceases. Persons with acute illness may remove the mask if it interferes with necessary medical care such as supplemental oxygen administered via an oxygen mask.

[8] Operators of conveyances or transportation hubs may impose requirements, or conditions for carriage, on persons requesting an exemption from the requirement to wear a mask, including medical consultation by a third party, medical documentation by a licensed medical provider, and/or other information as determined by the operator, as well as require evidence that the person does not have COVID-19 such as a negative result from a SARS-CoV-2 viral test or documentation of recovery from COVID-19. CDC definitions for SARS-CoV-2 viral test and documentation of recovery are available in the Frequently Asked Questions at: https://www.cdc.gov/coronavirus/2019-ncov/travelers/testing-international-air-travelers.html. Operators may also impose additional protective measures that improve the ability of a person eligible for exemption to maintain social distance (separation from others by 6 feet), such as scheduling travel at less crowded times or on less crowded conveyances, or seating or otherwise situating the individual in a less crowded section of the conveyance or transportation hub. Operators may further require that persons seeking exemption from the requirement to wear a mask request an accommodation in advance.

- A child under the age of 2 years;
- A person with a disability who cannot wear a mask, or cannot safely wear a mask, because of the disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 et seq.).[9]
- A person for whom wearing a mask would create a risk to workplace health, safety, or job duty as determined by the relevant workplace safety guidelines or federal regulations.

This Order exempts the following categories of conveyances, including persons on board such conveyances:

- Private conveyances operated solely for personal, non-commercial use;
- Commercial motor vehicles or trucks as these terms are defined in 49 CFR 390.5, if the driver is the sole occupant of the vehicle or truck;
- Conveyances operated or chartered by the U.S. military services provided that such conveyance operators observe Department of Defense precautions to prevent the transmission of COVID-19 that are equivalent to the precautions in this Order.

This Order applies to persons on conveyances and at transportation hubs directly operated by U.S. state, local, territorial, or tribal government authorities, as well as the operators themselves. U.S. state, local, territorial, or tribal government authorities directly operating conveyances and transportation hubs may be subject to additional federal authorities or actions, and are encouraged to implement additional measures enforcing the provisions of this Order regarding persons traveling onboard conveyances and at transportation hubs operated by these government entities.

To the extent permitted by law, and consistent with President Biden's Executive Order of January 21, 2021 (Promoting COVID-19 Safety in Domestic and International Travel),[10] Federal agencies are required to implement additional measures enforcing the provisions of this Order.

BACKGROUND:

There is currently a pandemic of respiratory disease (coronavirus disease 2019 or "COVID-19") caused by a novel coronavirus (SARS-COV-2). As of January 27, 2021, there have been 99,638,507 confirmed cases of COVID-19 globally, resulting in more than 2,141,000 deaths. As of January 27, 2021, there have been over 25,000,000 cases identified in the United States and over 415,000 deaths due to the disease. New SARS-CoV-2 variants have emerged in recent weeks, including at least one with evidence of increased transmissibility.[11]

The virus that causes COVID-19 spreads very easily and sustainably between people who are in close contact with one another (within about 6 feet) mainly through respiratory droplets

---

[9] This is a narrow exception that includes a person with a disability who cannot wear a mask for reasons related to the disability. CDC will issue additional guidance regarding persons who cannot wear a mask under this exemption. https://www.cdc.gov/quarantine/masks/mask-travel-guidance.html

[10] https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/21/executive-order-promoting-covid-19-safety-in-domestic-and-international-travel/

[11] https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/scientific-brief-emerging-variants.html

produced when an infected person coughs, sneezes, or talks. These droplets can land in the mouths, eyes, or noses of people who are nearby and possibly be inhaled into the lungs. Infected people without symptoms (asymptomatic) and those in whom symptoms have not yet developed (pre-symptomatic) can also spread the virus. In general, the more closely an infected person interacts with others and the longer those interactions, the higher the risk of COVID-19 spread. COVID-19 may be transmitted by touching surfaces or objects that have the virus on them and then touching one's own or another person's eyes, nose, or mouth.

Masks help prevent people who have COVID-19, including those who are pre-symptomatic or asymptomatic, from spreading the virus to others.[12] Masks are primarily intended to reduce the emission of virus-laden droplets, i.e., they act as source control by blocking exhaled virus.[13] This is especially relevant for asymptomatic or pre-symptomatic infected wearers who feel well and may be unaware of their infectiousness to others, and who are estimated to account for more than 50% of transmissions.[14,15] Masks also provide personal protection to the wearer by reducing inhalation of these droplets, i.e., they reduce wearers' exposure through filtration.[16] The community benefit of wearing masks for SARS-CoV-2 control is due to the combination of these effects; individual prevention benefit increases with increasing numbers of people using masks consistently and correctly.

Appropriately worn masks reduce the spread of COVID-19—particularly given the evidence of pre-symptomatic and asymptomatic transmission of COVID-19. Seven studies have confirmed the benefit of universal masking in community level analyses: in a unified hospital system,[17] a German city,[18] a U.S. State,[19] a panel of 15 U.S. States and Washington, D.C.,[20,21] as

---

[12] https://www.cdc.gov/coronavirus/2019-ncov/more/masking-science-sars-cov2.html

[13] Leung NHL, Chu DKW, Shiu EYC, et al. Respiratory virus shedding in exhaled breath and efficacy of face masks. *Nature Medicine*. 2020;26(5):676-680.https://dx.doi.org/10.1038/s41591-020-0843-2

[14] Moghadas SM, Fitzpatrick MC, Sah P, et al. The implications of silent transmission for the control of COVID-19 outbreaks. *Proc Natl Acad Sci U S A*. 2020;117(30):17513-17515.10.1073/pnas.2008373117. https://www.ncbi.nlm.nih.gov/pubmed/32632012

[15] Johansson MA, Quandelacy TM, Kada S, et al. SARS-CoV-2 Transmission From People Without COVID-19 Symptoms. Johansson MA, et al. JAMA Netw Open. 2021 Jan 4;4(1):e2035057. doi: 10.1001/jamanetworkopen.2020.35057.

[16] Ueki H, Furusawa Y, Iwatsuki-Horimoto K, et al. Effectiveness of Face Masks in Preventing Airborne Transmission of SARS-CoV-2. *mSphere*. 2020;5(5).10.1128/mSphere.00637-20. https://www.ncbi.nlm.nih.gov/pubmed/33087517

[17] Wang X, Ferro EG, Zhou G, Hashimoto D, Bhatt DL. Association Between Universal Masking in a Health Care System and SARS-CoV-2 Positivity Among Health Care Workers. *JAMA*. 2020.10.1001/jama.2020.12897. https://www.ncbi.nlm.nih.gov/pubmed/32663246

[18] Mitze T., Kosfeld R., Rode J., Wälde K. *Face Masks Considerably Reduce COVID-19 Cases in Germany: A Synthetic Control Method Approach*. IZA – Institute of Labor Economics (Germany);2020.ISSN: 2365-9793, DP No. 13319. http://ftp.iza.org/dp13319.pdf

[19] Gallaway MS, Rigler J, Robinson S, et al. Trends in COVID-19 Incidence After Implementation of Mitigation Measures – Arizona, January 22-August 7, 2020. *MMWR Morb Mortal Wkly Rep*. 2020;69(40):1460-1463.10.15585/mmwr.mm6940e3. https://www.ncbi.nlm.nih.gov/pubmed/33031366

[20] Lyu W, Wehby GL. Community Use Of Face Masks And COVID-19: Evidence From A Natural Experiment Of State Mandates In The US. *Health Aff (Millwood)*. 2020;39(8):1419-1425.10.1377/hlthaff.2020.00818. https://www.ncbi.nlm.nih.gov/pubmed/32543923

[21] Hatzius J, Struyven D, Rosenberg I. Face Masks and GDP. *Goldman Sachs Research* https://www.goldmansachs.com/insights/pages/face-masks-and-gdp.html. Accessed January 20, 2021.

6

well as both Canada[22] and the United States[23] nationally. Each analysis demonstrated that, following directives from organizational and political leadership for universal masking, new infections fell significantly. Two of these studies[24,25] and an additional analysis of data from 200 countries that included localities within the United States[26] also demonstrated reductions in mortality. An economic analysis using U.S. data found that, given these effects, increasing universal masking by 15% could prevent the need for lockdowns and reduce associated losses of up to $1 trillion or about 5% of gross domestic product.[27]

Wearing a mask especially helps protect those at increased risk of severe illness from COVID-19[28] and workers who frequently come into close contact with other people (e.g., at transportation hubs). Masks are most likely to reduce the spread of COVID-19 when they are widely used by people in public settings. Using masks along with other preventive measures, including social distancing, frequent handwashing, and cleaning and disinfecting frequently touched surfaces, is one of the most effective strategies available for reducing COVID-19 transmission.

Traveling on multi-person conveyances increases a person's risk of getting and spreading COVID-19 by bringing persons in close contact with others, often for prolonged periods, and exposing them to frequently touched surfaces. Air travel often requires spending time in security lines and crowded airport terminals. Social distancing may be difficult if not impossible on flights. People may not be able to distance themselves by the recommended 6 feet from individuals seated nearby or those standing in or passing through the aircraft's aisles. Travel by bus, train, vessel, and other conveyances used for international, interstate, or intrastate transportation pose similar challenges.

Intrastate transmission of the virus has led to—and continues to lead to—interstate and international spread of the virus, particularly on public conveyances and in travel hubs, where passengers who may themselves be traveling only within their state or territory commonly interact with others traveling between states or territories or internationally. Some states, territories, Tribes,

[22] Karaivanov A., Lu S.E., Shigeoka H., Chen C., Pamplona S. *Face Masks, Public Policies and Slowing the Spread of Covid-19: Evidence from Canada* National Bureau of Economic Research 2020.Working Paper 27891. http://www.nber.org/papers/w27891

[23] Chernozhukov V, Kasahara H, Schrimpf P. Causal Impact of Masks, Policies, Behavior on Early Covid-19 Pandemic in the U.S. J Econom. 2021 Jan;220(1):23-62. doi: 10.1016/j.jeconom.2020.09.003. Epub 2020 Oct 17.

[24] Hatzius J, Struyven D, Rosenberg I. Face Masks and GDP. *Goldman Sachs Research* https://www.goldmansachs.com/insights/pages/face-masks-and-gdp.html. Accessed January 20, 2021.

[25] Chernozhukov V, Kasahara H, Schrimpf P. Causal Impact of Masks, Policies, Behavior on Early Covid-19 Pandemic in the U.S. J Econom. 2021 Jan;220(1):23-62. doi: 10.1016/j.jeconom.2020.09.003. Epub 2020 Oct 17.

[26] Leffler CT, Ing EB, Lykins JD, Hogan MC, McKeown CA, Grzybowski A. Association of country-wide coronavirus mortality with demographics, testing, lockdowns, and public wearing of masks. Am J Trop Med Hyg. 2020 Dec;103(6):2400-2411. doi: 10.4269/ajtmh.20-1015. Epub 2020 Oct 26.

[27] Hatzius J, Struyven D, Rosenberg I. Face Masks and GDP. *Goldman Sachs Research* https://www.goldmansachs.com/insights/pages/face-masks-and-gdp.html. Accessed January 20, 2021.

[28] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html

and local public health authorities have imposed mask-wearing requirements within their juris-dictional boundaries to protect public health.[29] Any state or territory without sufficient mask-wearing requirements for transportation systems within its jurisdiction has not taken adequate measures to prevent the spread of COVID-19 from such state or territory to any other state or territory. That determination is based on, *inter alia*, the rapid and continuing transmission of the virus across all states and territories and across most of the world. Furthermore, given how inter-connected most transportation systems are across the nation and the world, local transmission can grow even more quickly into interstate and international transmission when infected persons travel on non-personal conveyances without wearing a mask and with others who are not wear-ing masks.

Therefore, I have determined that the mask-wearing requirements in this Order are reasonably necessary to prevent the further introduction, transmission, or spread of COVID-19 into the United States and among the states and territories. Individuals traveling into or departing from the United States, traveling interstate, or traveling entirely intrastate, conveyance operators that transport such individuals, and transportation hub operators that facilitate such transporta-tion, must comply with the mask-wearing requirements set forth in this Order.

America's transportation systems are essential. Not only are they essential for public health, they are also essential for America's economy and other bedrocks of American life. Those transportation systems carry life-saving medical supplies and medical providers into and across the nation to our hospitals, nursing homes, and physicians' offices. Trains, planes, ships, and automobiles bring food and other essentials to our communities and to our homes. Buses bring America's children and teachers to school. Buses, trains, and subways, bring America's workforce to their jobs.

Requiring masks on our transportation systems will protect Americans and provide confidence that we can once again travel safely even during this pandemic. Therefore, requiring masks will help us control this pandemic and aid in re-opening America's economy.

The United States and countries around the world are currently embarking on efforts to vac-cinate their populations, starting with healthcare personnel and other essential workers at in-creased risk of exposure to SARS-CoV-2 and people at increased risk for severe illness from the virus. While vaccines are highly effective at preventing severe or symptomatic COVID-19, at this time there is limited information on how much the available COVID-19 vaccines may reduce transmission in the general population and how long protection lasts.[30] Therefore, this mask requirement, as well as CDC recommendations to prevent spread of COVID-19,[31] additionally apply to vaccinated persons. Similarly, CDC recommends that people who have

---

[29] Based on internet sources, 37 states plus D.C. and Puerto Rico mandate the wearing of masks in public. Among the jurisdictions that have imposed mask mandates, variations in requirements exist. For example, exemptions for children range in cutoff age from 2 to 12, but masks are generally required in indoor public spaces such as restau-rants and stores, on public transit and ride-hailing services, and outdoors when unable to maintain 6 feet of distance from others. *See* https://www.aarp.org/health/healthy-living/info-2020/states-mask-mandates-coronavirus.html (ac-cessed January 28, 2021).

[30] https://www.cdc.gov/vaccines/covid-19/info-by-product/clinical-considerations.html

[31] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html

recovered from COVID-19 continue to take precautions to protect themselves and others, including wearing masks;[32] therefore, this mask requirement also applies to people who have recovered from COVID-19.

ACTION:

Until further notice, under 42 U.S.C. 264(a) and 42 CFR 70.2, 71.31(b), and 71.32(b), unless excluded or exempted as set forth in this Order, a person must wear a mask while boarding, disembarking, and traveling on any conveyance into or within the United States. A person must also wear a mask at any transportation hub that provides transportation within the United States.

Conveyance operators traveling into or within the United States may transport only persons wearing masks and must use best efforts to ensure that masks are worn when embarking, disembarking, and throughout the duration of travel. Operators of transportation hubs must use best efforts to ensure that any person entering or on the premises of the transportation hub wears a mask.

As a condition of receiving controlled free pratique under 42 CFR 71.31(b) to enter a U.S. port, disembark passengers, and begin operations at any U.S. port of entry, conveyances arriving into the United States must require persons to wear masks while boarding, disembarking, and for the duration of travel. Conveyance operators must also require all persons to wear masks while boarding and for the duration of their travel on board conveyances departing from the United States until the conveyance arrives at the foreign destination, if at any time any of the persons onboard (passengers, crew, or conveyance operators) will return to the United States while this Order remains in effect. These travel conditions are necessary to mitigate the harm of further introduction of COVID-19 into the United States.

Requiring a properly worn mask is a reasonable and necessary measure to prevent the introduction, transmission and spread of COVID-19 into the United States and among the states and territories under 42 U.S.C. 264(a) and 42 CFR 71.32(b). Among other benefits, masks help prevent dispersal of an infected person's respiratory droplets that carry the virus. That precaution helps prevent droplets from landing in the eye, mouth, or nose or possibly being inhaled into the lungs of an uninfected person, or from landing on a surface or object that an uninfected person may then touch and then touch his or her own or another's eyes, nose, or mouth. Masks also provide some protection to the wearer by helping reduce inhalation of respiratory droplets.

This Order shall not apply within any state, locality, territory, or area under the jurisdiction of a Tribe, where the controlling governmental authority: (1) requires a person to wear a mask on conveyances; (2) requires a person to wear a mask at transportation hubs; and (3) requires conveyances to transport only persons wearing masks. Those requirements must provide the same level of public health protection as —or greater protection than—the requirements listed herein.

In accordance with 42 U.S.C. 264(e), state, local, territorial, and tribal authorities may impose additional requirements that provide greater public health protection and are more restrictive than

---

[32] https://www.cdc.gov/coronavirus/2019-ncov/hcp/duration-isolation.html

the requirements in this Order. Consistent with other federal, state, or local legal requirements, this Order does not preclude operators of conveyances or transportation hubs from imposing additional requirements, or conditions for carriage, that provide greater public health protection and are more restrictive than the requirements in this Order (e.g., requiring a negative result from a SARS-CoV-2 viral test or documentation of recovery from COVID-19 or imposing requirements for social distancing or other recommended protective measures).

This Order is not a rule within the meaning of the Administrative Procedure Act ("APA") but rather is an emergency action taken under the existing authority of 42 U.S.C. 264(a) and 42 CFR 70.2, 71.31(b), 71.32(b). In the event that a court determines this Order qualifies as a rule under the APA, notice and comment and a delay in effective date are not required because there is good cause to dispense with prior public notice and comment and the opportunity to comment on this Order and the delay in effective date. Considering the public health emergency caused by COVID-19, it would be impracticable and contrary to the public's health, and by extension the public's interest, to delay the issuance and effective date of this Order. Similarly, the Office of Information and Regulatory Affairs has determined that if this Order were a rule, it would be a major rule under the Congressional Review Act, but there would not be a delay in its effective date as the agency has determined that there would be good cause to make the requirements herein effective immediately under the APA.

This order is also an economically significant regulatory action under Executive Order 12866 and has therefore been reviewed by the Office of Information and Regulatory Affairs of the Office of Management and Budget. The agency is proceeding without the complete analysis required by Executive Order 12866 under the emergency provisions of 6(a)(3)(D) of that Order.

If any provision of this Order, or the application of any provision to any carriers, conveyances, persons, or circumstances, shall be held invalid, the remainder of the provisions, or the application of such provisions to any carriers, conveyances, persons, or circumstances other than those to which it is held invalid, shall remain valid and in effect.

To address the COVID-19 public health threat to transportation security, this Order shall be enforced by the Transportation Security Administration under appropriate statutory and regulatory authorities including the provisions of 49 U.S.C. 106, 114, 44902, 44903, and 46301; and 49 CFR part 1503, 1540.105, 1542.303, 1544.305 and 1546.105.

This Order shall be further enforced by other federal authorities and may be enforced by cooperating state and local authorities through the provisions of 18 U.S.C. 3559, 3571; 42 U.S.C. 243, 268, 271; and 42 CFR 70.18 and 71.2.[33]

---

[33] While this Order may be enforced and CDC reserves the right to enforce through criminal penalties, CDC does not intend to rely primarily on these criminal penalties but instead strongly encourages and anticipates widespread voluntary compliance as well as support from other federal agencies in implementing additional civil measures enforcing the provisions of this Order, to the extent permitted by law and consistent with President Biden's Executive Order of January 21, 2021 (Promoting COVID-19 Safety in Domestic and International Travel).

<u>EFFECTIVE DATE</u>:

This Order shall enter into effect on February 1, 2021, at 11:59 p.m. and will remain in effect un-less modified or rescinded based on specific public health or other considerations, or until the Secretary of Health and Human Services rescinds the determination under section 319 of the Public Health Service Act (42 U.S.C. 247d) that a public health emergency exists.

In testimony whereof, the Director of the Division of Global Migration and Quarantine at the Centers for Disease Control and Prevention, U.S. Department of Health and Human Services, has hereunto set his hand at Atlanta, GA, this 29th day of January 2021.

Martin S. Cetron, M.D.
Director, Division of Global Migration and Quarantine
Centers for Disease Control and Prevention

# EXHIBIT (2)



**STATE OF ILLINOIS**

**EXECUTIVE DEPARTMENT**

**SPRINGFIELD, ILLINOIS**

**FILED**
INDEX DEPARTMENT
JUN 2 5 2021
IN THE OFFICE OF
SECRETARY OF STATE

# Gubernatorial Disaster Proclamation

**WHEREAS,** since early March 2020, Illinois has faced a pandemic that has caused extraordinary sickness and loss of life, infecting over 1,390,000, and taking the lives of more than 23,100 residents; and,

**WHEREAS,** protecting the health and safety of Illinoisans is among the most important functions of State government; and,

**WHEREAS,** as Illinois continues to respond to the public health disaster caused by Coronavirus Disease 2019 (COVID-19), a novel severe acute respiratory illness that spreads rapidly through respiratory transmissions, the burden on residents, healthcare providers, first responders, and governments throughout the State has been unprecedented; and,

**WHEREAS,** the World Health Organization declared COVID-19 a Public Health Emergency of International Concern on January 30, 2020, and the United States Secretary of Health and Human Services declared that COVID-19 presents a public health emergency on January 27, 2020; and,

**WHEREAS,** on March 11, 2020, the World Health Organization characterized the COVID-19 outbreak as a pandemic, and has now reported nearly 180 million confirmed cases of COVID-19 and nearly 3.9 million deaths attributable to COVID-19 globally; and,

**WHEREAS,** despite efforts to contain COVID-19, the virus has continued to spread rapidly, resulting in the need for federal and State governments to take significant steps; and,

**WHEREAS,** COVID-19 vaccines are effective at preventing COVID-19 disease, especially severe illness and death, but a proportion of the population remains unvaccinated and some residents, including younger children, cannot yet receive the vaccine; and,

**WHEREAS,** on March 9, 2020, I, JB Pritzker, Governor of Illinois, declared all counties in the State of Illinois as a disaster area in response to the outbreak of COVID-19; and,

**WHEREAS,** on March 13, 2020, the President declared a nationwide emergency pursuant to Section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121-5207 (the "Stafford Act"), covering all states and territories, including Illinois; and,

**WHEREAS,** on March 26, 2020, the President declared a major disaster in Illinois pursuant to Section 401 of the Stafford Act; and,

**WHEREAS,** on April 1, 2020, due to the exponential spread of COVID-19 in Illinois, I declared all counties in the State of Illinois as a disaster area; and,

INDEX DEPARTMENT

JUN 25 2021

IN THE OFFICE OF
SECRETARY OF STATE

**WHEREAS**, on April 30, 2020, due to the continued spread of COVID-19 in Illinois, the threatened shortages of hospital beds, ER beds, and ventilators, and the inadequate testing capacity, I declared all counties in the State of Illinois as a disaster area; and,

**WHEREAS**, on May 29, 2020, due to the continued spread of COVID-19 in Illinois, and the resulting health and economic impacts of the virus, and the need to increase testing capacity, I declared all counties in the State of Illinois as a disaster area; and,

**WHEREAS**, on June 26, 2020, due to the further spread of COVID-19 in Illinois, the continuing health and economic impacts of the virus, and the need to continue to increase testing capacity and preserve our progress against the disease, I declared all counties in the State of Illinois as a disaster area; and,

**WHEREAS**, on July 24, 2020, due to the resurgence of COVID-19 in Illinois, the continuing health and economic impacts of the virus, and the need to continue to increase testing capacity and preserve our progress against the disease, I declared all counties in the State of Illinois as a disaster area; and,

**WHEREAS**, on August 21, 2020, due to the resurgence of COVID-19 in Illinois, the continuing health and economic impacts of the virus, and the need to continue to increase testing capacity and preserve our progress against the disease, I declared all counties in the State of Illinois as a disaster area; and,

**WHEREAS**, on September 18, 2020, due to the resurgence of COVID-19 in Illinois, the continuing health and economic impacts of the virus, and the need to continue to increase testing capacity and preserve our progress against the disease, I declared all counties in the State of Illinois as a disaster area; and,

**WHEREAS**, on October 16, 2020, due to the resurgence of COVID-19 in Illinois, the continuing health and economic impacts of the virus, and the need to continue to increase testing capacity and preserve our progress against the disease, I declared all counties in the State of Illinois as a disaster area; and,

**WHEREAS**, on November 13, 2020, due to the increased spread of COVID-19 in Illinois, the continuing health and economic impacts of the virus, and the need to continue to increase testing capacity and preserve our progress against the disease, I declared all counties in the State of Illinois as a disaster area; and,

**WHEREAS**, on December 11, 2020, due to the continued rapid spread of COVID-19 in Illinois, the health and economic impacts of the virus, and the need to continue to increase testing capacity and preserve our progress against the disease, I declared all counties in the State of Illinois as a disaster area; and,

**WHEREAS**, on January 8, 2021, due to the continued rapid spread of COVID-19 in Illinois, and the health and economic impacts of the virus, I declared all counties in the State of Illinois as a disaster area; and,

**WHEREAS**, on February 5, 2021, due to the continued rapid spread of COVID-19 in Illinois, and the health and economic impacts of the virus, I declared all counties in the State of Illinois as a disaster area; and,

**WHEREAS**, on March 5, 2021, due to the continued rapid spread of COVID-19 in Illinois, and the health and economic impacts of the virus, I declared all counties in the State of Illinois as a disaster area; and,

**WHEREAS**, on April 2, 2021, due to the continued rapid spread of COVID-19 in Illinois, and the health and economic impacts of the virus, I declared all counties in the State of Illinois as a disaster area; and,

**WHEREAS**, on April 30, 2021, due to the continued rapid spread of COVID-19 in Illinois, and the health and economic impacts of the virus, I declared all counties in the State of Illinois as a disaster area; and,

FILED DEPARTMENT
JUN 25 2021
IN THE OFFICE OF
SECRETARY OF STATE

**WHEREAS**, on May 28, 2021, due to the continued rapid spread of COVID-19 in Illinois, and the ongoing health and economic impacts of the virus, I declared all counties in the State of Illinois as a disaster area; and,

**WHEREAS**, as circumstances surrounding COVID-19 have evolved and new evidence emerges, there have been frequent changes in information and public health guidance; and,

**WHEREAS**, the unprecedented nature of COVID-19, including the health consequences it has on not just the respiratory system but the heart, brain, kidneys, and the body's immune response, has made the virus's effects and its path difficult to predict; and,

**WHEREAS**, social distancing, face coverings, and other public health precautions have proven to be critical in slowing and stopping the spread of COVID-19; and,

**WHEREAS**, the Centers for Disease Control and Prevention ("CDC") recently updated its guidance for fully vaccinated people,[1] indicating that they can resume numerous activities without wearing a mask or staying 6 feet apart, except where required by federal, state, local, tribal, or territorial laws, rules, and regulations, including local business and workplace guidance; and,

**WHEREAS**, the CDC continues to advise that cloth face coverings or masks protect persons who are not fully vaccinated from COVID-19; and,

**WHEREAS**, the CDC advises that schools continue to use the COVID-19 prevention strategies outlined in the CDC's Operational Strategy for K-12 Schools for at least the remainder of the 2020-2021 academic school year; and,

**WHEREAS**, the CDC continues to advise that day care providers continue to use COVID-19 prevention strategies, including masking and physical distancing, even after day care providers and their staff are vaccinated; and

**WHEREAS**, some people infected by the virus remain asymptomatic but nonetheless may spread it to others; and,

**WHEREAS**, public health guidance advises that minimizing physical interactions between people who are not fully vaccinated and who do not reside in the same household is critical to slowing the spread of COVID-19; and,

**WHEREAS**, as COVID-19 has spread in Illinois over the course of the Gubernatorial Disaster Proclamations, the circumstances causing a disaster throughout the State have changed and continue to change, making definitive predictions of the course the virus will take over the coming months extremely difficult; and,

**WHEREAS**, at the time I issued the first Gubernatorial Disaster Proclamation, there were 11 confirmed cases of COVID-19 in one Illinois county; and,

**WHEREAS**, as of today, there have been over 1,390,000 confirmed cases of COVID-19 in all 102 Illinois counties; and,

**WHEREAS**, the first death attributed to COVID-19 in Illinois was announced on March 17, 2020; and,

**WHEREAS**, as of today, more than 23,100 residents of Illinois have died due to COVID-19; and,

**WHEREAS**, from the outset, studies have suggested that for every confirmed case there are many more unknown cases, some of which are asymptomatic individuals who can pass the virus to others without knowing; and,

---

[1] Individuals are considered fully vaccinated 2 weeks after their second dose in a 2-dose series, such as the Pfizer or Moderna vaccines, or 2 weeks after a single-dose vaccine, such as Johnson & Johnson's Janssen vaccine. Individuals who do not meet these requirements, regardless of age, are not considered fully vaccinated.

INDEX DEPARTMENT

JUN 2 5 2021

IN THE OFFICE OF
SECRETARY OF STATE

**WHEREAS,** while the number of new COVID-19 cases in Illinois has decreased recently, the virus continues to infect too many individuals and claim the lives of too many Illinoisans each day; and,

**WHEREAS,** the COVID-19 pandemic is not limited to the most populous counties, and all regions of the State continue to face significant COVID-19 risk; and,

**WHEREAS,** without precautions COVID-19 can spread exponentially, even in less populous areas; and,

**WHEREAS,** the State and the Illinois Department of Public Health have developed and continued to update a detailed mitigation plan to trigger additional precautions when regions meet certain risk levels; and,

**WHEREAS,** the U.S. has surpassed 33.4 million total cases and 600,000 deaths; and,

**WHEREAS,** COVID-19 has claimed the lives of and continues to impact the health of Black and Hispanic Illinoisans at a disproportionately high rate – magnifying significant health disparities and inequities; and,

**WHEREAS,** the Illinois Department of Public Health activated its Illinois Emergency Operations Plan and its Emergency Support Function 8 Plan to coordinate emergency response efforts by hospitals, local health departments, and emergency management systems in order to avoid a surge in the use of hospital resources and capacity; and,

**WHEREAS,** as the virus has progressed through Illinois, the crisis facing the State continues to develop and requires an evolving response to ensure hospitals, health care professionals and first responders are able to meet the health care needs of all Illinoisans and in a manner consistent with CDC guidance that continues to be updated; and,

**WHEREAS,** in order to ensure that health care professionals, first responders, hospitals and other facilities are able to meet the health care needs of all residents of Illinois, the State must have critical supplies, including PPE, such as masks, face shields, gowns, and gloves; and,

**WHEREAS,** the State of Illinois maintains a stockpile that supports the existing PPE supply chains and stocks at various healthcare facilities; and,

**WHEREAS,** while the State continues to make every effort to ensure an adequate supply of PPE, if those procurement efforts are disrupted or Illinois experiences a surge in COVID-19 cases, the State may face a life-threatening shortage of critical supplies for health care workers and first responders; and,

**WHEREAS,** Illinois continues to use a significant number of hospital beds and ICU beds; and, if COVID-19 cases surge, the State could face a shortage of critical health care resources; and,

**WHEREAS,** Illinois now has tested more than 25.6 million total specimens for COVID-19; and,

**WHEREAS,** in addition to causing the tragic loss of more than 23,100 Illinoisans and wreaking havoc on the physical health of tens of thousands more, COVID-19 has caused extensive economic loss and continues to threaten the financial welfare of a significant number of individuals and businesses across the nation and the State; and,

**WHEREAS,** nationwide, more than 75 million people have filed unemployment claims since the start of the pandemic; and,

**WHEREAS,** the Illinois Department of Employment Security announced that the State's unemployment rate continues to be high; and,

**WHEREAS,** the Illinois Department of Employment Security is responding to the economic crisis in a number of ways, including through the Pandemic Unemployment Assistance program; and,

**WHEREAS,** the Department of Commerce and Economic Opportunity is working to address the economic crisis, including through assistance programs such as the Business Interruption Grants

INDEX DEPARTMENT

JUN 25 2021

IN THE OFFICE OF
SECRETARY OF STATE

Program for businesses that experienced a limited ability to operate due to COVID-19 related closures; and,

**WHEREAS**, many executive agencies in the State continue to focus significant resources on the ongoing response to the COVID-19 pandemic; and,

**WHEREAS**, many State agencies will have a role in administering American Rescue Plan and Coronavirus State and Local Fiscal Recovery Funds over the coming months; and,

**WHEREAS**, the COVID-19 pandemic has required the Illinois Department of Agriculture (IDOA) to address the outbreak's impact on the State's food supply chain through regulation and oversight of meat and poultry facilities and livestock management facilities; and

**WHEREAS**, the COVID-19 pandemic's disruption to the livestock market has required IDOA to concentrate its resources on working with livestock owners and producers in addressing safe and environmental animal disposal concerns through its oversight and regulation of the Dead Animal Disposal Act; and

**WHEREAS**, IDOA regulates and investigates many other industries that have been directly impacted by the COVID-19 pandemic including, but not limited to, pesticide applicators, animal shelters, pet shops, and gas stations, and the continued, proper regulation of these industries requires IDOA to commit additional time and resources into creating new procedures for conducting remote investigations and trainings; and

**WHEREAS**, the COVID-19 pandemic's detrimental impact to IDOA's regulated industries has required IDOA to place additional time and resources into organizing and managing the timely implementation of the Business Interruption Grant Program; and

**WHEREAS**, the economic loss and insecurity caused by COVID-19 threatens the viability of business and the access to housing, medical care, food, and other critical resources that directly impact the health and safety of residents; and,

**WHEREAS**, access to housing helps prevent spread of COVID-19 because individuals with housing are able to minimize physical contact with those outside their households; and,

**WHEREAS**, temporarily halting eviction proceedings avoids numerous interactions associated with being evicted, including with law enforcement officers, courtroom personnel, landlords, movers, and friends and family who agree to provide temporary housing, as well as, for those who are forced into homelessness, the interactions associated with taking refuge in a shelter; and,

**WHEREAS**, preventing spread by temporarily halting eviction proceedings thus also continues to help prevent spread of COVID-19 in the broader community; and,

**WHEREAS**, COVID-19 also has been extraordinarily disruptive to schools, and it is among the highest priorities of the State to ensure that students are able to obtain a quality education and that schools are able to provide an environment that is safe for students, teachers, and the community; and,

**WHEREAS**, based on the foregoing facts, and considering the rapid spread of COVID-19 and the ongoing health and economic impacts that will be felt over the coming month by people across the State, the current circumstances in Illinois surrounding the spread of COVID-19 constitute an epidemic emergency and a public health emergency under Section 4 of the Illinois Emergency Management Agency Act; and,

**WHEREAS**, based on the foregoing, the continuing burden on hospital resources, the ongoing potential that the State could face shortages of these resources in the event of a surge in infections, and the critical need to increase the purchase and distribution of PPE as well as to continue to expand COVID-19 testing capacity constitute a public health emergency under Section 4 of the Illinois Emergency Management Agency Act; and,

**WHEREAS**, it is the policy of the State of Illinois to be prepared to address any disasters and, therefore, it is necessary and appropriate to make additional State resources available to ensure that that our healthcare delivery system is capable of serving those who are sick and that Illinoisans remain safe and secure and able to obtain medical care; and,

FILED

INDEX DEPARTMENT

JUN 2 5 2021

IN THE OFFICE OF
SECRETARY OF STATE

**WHEREAS**, this proclamation will assist the State in facilitating economic recovery for individuals and businesses in an effort to prevent further devastating consequences from the economic instability COVID-19 has caused; and,

**WHEREAS**, this proclamation will assist Illinois agencies in coordinating State and Federal resources, including materials needed to test for COVID-19, personal protective equipment, and medicines, in an effort to support the State responses as well as the responses of local governments to the present public health emergency; and,

**WHEREAS**, this proclamation will assist Illinois agencies in coordinating State and Federal recovery funds; and,

**WHEREAS**, these conditions provide legal justification under Section 7 of the Illinois Emergency Management Agency Act for the new issuance of a proclamation of disaster; and,

**WHEREAS**, the Illinois Constitution, in Article V, Section 8, provides that "the Governor shall have the supreme executive power, and shall be responsible for the faithful execution of the laws," and states, in the Preamble, that a central purpose of the Illinois Constitution is "provide for the health, safety, and welfare of the people";

**NOW, THEREFORE**, in the interest of aiding the people of Illinois and the local governments responsible for ensuring public health and safety, I, JB Pritzker, Governor of the State of Illinois, hereby proclaim as follows:

**Section 1.** Pursuant to the provisions of Section 7 of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7, I find that a disaster exists within the State of Illinois and specifically declare all counties in the State of Illinois as a disaster area. The proclamation authorizes the exercise of all of the emergency powers provided in Section 7 of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7, including but not limited to those specific emergency powers set forth below.

**Section 2.** The Illinois Department of Public Health and the Illinois Emergency Management Agency are directed to coordinate with each other with respect to planning for and responding to the present public health emergency.

**Section 3.** The Illinois Department of Public Health is further directed to cooperate with the Governor, other State agencies and local authorities, including local public health authorities, in the development and implementation of strategies and plans to protect the public health in connection with the present public health emergency.

**Section 4.** The Illinois Emergency Management Agency is directed to implement the State Emergency Operations Plan to coordinate State resources to support local governments in disaster response and recovery operations.

**Section 5.** To aid with emergency purchases necessary for response and other emergency powers as authorized by the Illinois Emergency Management Agency Act, the provisions of the Illinois Procurement Code that would in any way prevent, hinder or delay necessary action in coping with the disaster are suspended to the extent they are not required by federal law. If necessary, and in accordance with Section 7(1) of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(1), the Governor may take appropriate executive action to suspend additional statutes, orders, rules, and regulations.

**Section 6.** Pursuant to Section 7(3) of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(3), this proclamation activates the Governor's authority, as necessary, to transfer the direction, personnel or functions of State departments and agencies or units thereof for the purpose of performing or facilitating emergency response programs.

**Section 7.** The Illinois Department of Public Health, Illinois Department of Insurance and the Illinois Department of Healthcare and Family Services are directed to recommend, and, as appropriate, take necessary actions to ensure expanded access to testing for COVID-19 and that consumers do not face financial barriers in accessing diagnostic testing and treatment services for COVID-19.

**Section 8.** The Illinois State Board of Education is directed to recommend, and, as appropriate, take necessary actions to address any impact to learning associated with the present public health emergency and to continue to alleviate any barriers to the use of remote learning during the effect of this proclamation that exist in the Illinois School Code, 105 ILCS 5/1-1 et. seq.

**Section 9.** All State agencies are directed to cooperate with the Governor, other State agencies and local authorities in the development and implementation of strategies and plans to cope with and recover from the economic impact of the present public health emergency.

**Section 10.** Pursuant to Section 7(14) of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(14), increases in the selling price of goods or services, including medical supplies, protective equipment, medications and other commodities intended to assist in the prevention of or treatment and recovery of COVID-19, shall be prohibited in the State of Illinois while this proclamation is in effect.

**Section 11.** This proclamation can facilitate requests for federal emergency and/or disaster assistance if a complete and comprehensive assessment of damage indicates that effective recovery is beyond the capabilities of the State and affected local governments.

**Section 12.** For purposes of Public Act 101-0640, Article 15, section 15-5, amending the Open Meetings Act, new section 5 ILCS 120/7(e)(4), I find that the ongoing public health concerns at issue in this proclamation continue to render in-person attendance of more than ten people at the regular meeting location not feasible. However, as the number of fully vaccinated individuals in Illinois continues to increase, I do not expect to make this finding again, and public bodies should plan on its expiration as of July 24, 2021.

**Section 13.** This proclamation shall be effective immediately and remain in effect for 30 days.

**In Witness Whereof,** *I have hereunto set my hand and caused the Great Seal of the State of Illinois to be affixed.*



*Done at the Capitol in the City of Springfield this 25th day of June in the Year of Our Lord two thousand and twenty one and of the State of Illinois two hundred and third.*

SECRETARY OF STATE

GOVERNOR

**FILED**
INDEX DEPARTMENT
JUN 2 5 2021
IN THE OFFICE OF
SECRETARY OF STATE

# EXHIBIT (3)


# Immunity Types

Immunity to a disease is achieved through the presence of **antibodies** to that disease in a person's system. Antibodies are proteins produced by the body to neutralize or destroy toxins or disease-carrying organisms. Antibodies are disease-specific. For example, measles antibody will protect a person who is exposed to measles disease, but will have no effect if he or she is exposed to mumps.

There are two types of immunity: active and passive.

## Active Immunity

**Active immunity** results when exposure to a disease organism triggers the immune system to produce antibodies to that disease. Exposure to the disease organism can occur through infection with the actual disease (resulting in **natural immunity**), or introduction of a killed or weakened form of the disease organism through vaccination (**vaccine-induced immunity**). Either way, if an immune person comes into contact with that disease in the future, their immune system will recognize it and immediately produce the antibodies needed to fight it.

Active immunity is long-lasting, and sometimes life-long.

## Passive Immunity

**Passive immunity** is provided when a person is *given* antibodies to a disease rather than producing them through his or her own immune system.

A newborn baby acquires passive immunity from its mother through the placenta. A person can also get passive immunity through antibody-containing blood products such as **immune globulin**, which may be given when immediate protection from a specific disease is needed. This is the major advantage to passive immunity; protection is immediate, whereas active immunity takes time (usually several weeks) to develop.

However, passive immunity lasts only for a few weeks or months. Only active immunity is long-lasting.

## Journal Articles on This Topic

1. Fox JP, Elveback L, Scott W, et al. Herd immunity: basic concept and relevance to public health immunization practices. Am J Epidemiol 1971; 94:179–89.
2. Anderson RM, May RM. Vaccination and herd immunity to infectious diseases. Nature 1985; 318:323–9.
3. Fine PEM. Herd immunity: history, theory, practice. Epidemiol Rev 1993; 15:265–302.
4. Fine PEM, Mulholland K. Community immunity. In: Plotkin SA, Orenstein WA, Offit PA eds. Vaccines. 5th ed. Chapter 71. Philadelphia, PA: Elsevier Inc., 2008:1573–92.
5. John TJ, Samuel R. Herd immunity and herd effect: new insights and definitions. Eur J Epidemiol 2000; 16:601–6.
6. Stephens DS. Vaccines for the unvaccinated: protecting the herd. J Inf Dis 2008; 197:643–45.
7. Heymann D, Aylward B. Mass vaccination in public health. In: Heymann D, ed. Control of communicable diseases manual. 19th ed. Washington, DC: American Public Health Association, 2008.
8. Topley WWC, Wilson GS. The spread of bacterial infection: the problem of herd immunity. J Hyg 1923; 21:243–9.

## Related Pages

How Vaccines Prevent Disease

Vaccines and Your Child's Immune System

How Vaccines Strengthen a Baby's Immune System

# EXHIBIT (4)

```
 1  STATE OF ILLINOIS )
```

**CERTIFIED COPY**

```
 2                   ) SS:

 3  COUNTY OF C O O K )

 4       IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

 5            COUNTY DEPARTMENT – LAW DIVISION

 6  JUSTIN MAHWIKIZI,                )

 7                      PLAINTIFF,   )

 8           –VS–                    ) NO. 2021 CH 01272

 9  IDPH AND DR. NGOZI EZIKE, IN HER )

10  OFFICIAL CAPACITY,               )

11                      DEFENDANTS.  )

12              REPORT OF PROCEEDINGS

13                 CHICAGO, ILLINOIS

14                  APRIL 30, 2021

15

16

17

18

19

20

21

22  ATKINSON–BAKER, A VERITEXT COMPANY
    (800) 288-3376
    WWW.DEPO.COM
23
    REPORTED BY:  CHERYL LYNN MOFFETT, CSR NO. 084-002218
24  FILE NO. AF034DC
```

1 STATE OF ILLINOIS )

2                    ) SS:

3 COUNTY OF C O O K )

4     IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

5          COUNTY DEPARTMENT - LAW DIVISION

6 JUSTIN MAHWIKIZI,                    )

7                      PLAINTIFF,    )

8           -VS-                   ) NO. 2021 CH 01272

9 IDPH AND DR. NGOZI EZIKE, IN HER   )

10 OFFICIAL CAPACITY,                  )

11                     DEFENDANTS.  )

12         Video conference report of proceedings had in

13 the above-entitled matter at Chicago, Illinois,

14 commencing at 10:22 a.m., on Friday, April 30, 2021,

15 before the Honorable EVE M. REILLY.

16

17

18

19

20

21

22

23

24

```
 1                    A P P E A R A N C E S

 2   FOR THE PLAINTIFF VIA ZOOM VIDEO CONFERENCE:

 3   MR. JUSTIN MAHWIKIZI, PRO SE

 4   18430 Francisco Avenue

 5   Homewood, Illinois 60430

 6   (267) 252-3305

 7   E-mail - Justin.Mahwikizi@gmail.com

 8

 9   FOR THE DEFENDANTS VIA ZOOM VIDEO CONFERENCE:

10   LAW OFFICES OF THE ILLINOIS ATTORNEY GENERAL

11   BY:  MS. GRETCHEN HELFRICH

12   100 West Randolph Street, 12th Floor

13   Chicago, Illinois  60601

14   (312) 814-3000

15   E-mail - gretchen.helfrich@illinois.gov

16                         *   *   *

17

18

19

20

21

22

23

24
```

```
1                   P R O C E E D I N G S
2           THE COURT:  This is Mahwikizi versus IDPH.
3  We're here on a motion for a temporary retraining order.
4  We're here to hear argument.  The case number is 21 CH
5  1272, and Mr. Mahwikizi is representing himself.  So,
6  whenever you're ready, go ahead.
7           MR. MAHWIKIZI:  Thank you, Your Honor.  Justin
8  Mahwikizi, pro se representing myself in Mahwikizi versus
9  IDPH.  This is an oral argument for a motion for
10 temporary retraining order regarding the IDPH's emergency
11 rules.  For the purpose of this hearing I'll address
12 myself as Mr. Mahwikizi for the court reporter.
13          Mr. Mahwikizi is a Christian observing the
14 Catholic denomination.  Mr. Mahwikizi conducts business
15 activities by providing business services in
16 transportation field.  By the designation of the IRS
17 rules, rideshare drivers are predominantly sole
18 proprietors or single-member LLCs, that stands for
19 limited liability corporations, although a few of us run
20 partnerships through multimember LLCs where we drive and
21 lease cars to other drivers.
22          Per one of the transportation network
23 providers, Uber, per their platform access agreement, and
24 I quote from it, it says the following:  "The
```

1  relationship between the parties is solely as independent

2  business enterprises, each of whom operates a separate

3  and distinct business enterprise that provides a service

4  outside the usual course of business of the other.  This

5  is not an employment agreement.  You're not an employee.

6  You confirm the existence and nature of that contractural

7  relationship each time you access our platform."

8          Secondly it says, "We do not," we as in Uber,

9  "we do not and have no right to direct or control you.

10  Subject to platform availability, you decide when and

11  where and whether you want to offer delivery services

12  facilitated by our platform and if you want to accept,

13  decline, ignore, or cancel a delivery request."

14          Transportation Network Providers like Uber and

15  Lyft consider drivers business owners and not employees.

16  Whether they are sole proprietors or LLCs is not of

17  consequence.  Their mask rules that they announced are

18  suggestions and not mandatory rules for drivers or

19  riders.  As the agreement said, they cannot compel or

20  force.

21          Finally, I just want to reiterate that

22  transportation network providers, like Uber and Lyft,

23  clearly denote that drivers are not employees, rather

24  business owners.  As in Sherbert versus Verner and in

1  Smith, Mr. Mahwikizi is being asked and/or penalized for

2  being a Christian.  He must choose between his religion

3  and his work.

4          Jesus Christ asks his followers to go out and

5  do the same as it pertains to the Good Samaritan teaching

6  where an individual, a man, was hurt in the middle of the

7  road, and multiple people passed by him without helping

8  him including priests, and only a Samaritan stopped and

9  gave aid to that person on the ground.  It didn't matter

10 what he looked like.  It didn't matter what his color

11 was.  He had to help.

12         Mr. Mahwikizi adhered by that principal

13 throughout his whole life.  He left a successful banking

14 career to provide this service as a way to get back good

15 with God.

16         IDPH asks Mr. Mahwikizi to refuse service to

17 people who don't have a mask or don't have a mask on

18 their nose.  This goes against Mr. Mahwikizi's religious

19 beliefs.  Specifically, it prohibits his communication of

20 his religious beliefs.

21         IDPH doesn't apply to businesses implicates a

22 subject class, specifically Christian business owners,

23 unlike Braunfeld V. Brown where the Supreme Court ruled a

24 Pennsylvania law establishing a day of rest on Sunday

1  thereby prohibiting retail sales was Constitutional even

2  if it financially impacted Jewish store owners who took

3  Saturday's days off.  IDPH rules force a specific

4  religion to not practice their religion.  It is a rift

5  (sic) in the Pennsylvania law in Braunfeld that forced

6  all Pennsylvania businesses to open on a Saturday thereby

7  implicating a suspect class of Jewish business owners who

8  observed the Sabbath on Saturdays.  This, Your Honor, as

9  the defendants prematurely submitted a motion to dismiss,

10  I will asking a leave to amend the complaint to include a

11  violation of --

12           THE REPORTER:  I'm sorry.  "To include a

13  violation of"?

14           MR. MAHWIKIZI:  A violation of first

15  amendment, specifically speech, the right to speech.

16  I'll be asking for leave to amend that complaint.

17           THE COURT:  Let's just focus on the temporary

18  retraining order right now because that's what we're here

19  for.

20           MR. MAHWIKIZI:  Yes, Your Honor.

21           Continuing, Mr. Mahwikizi will prove through

22  the evidentiary phase that IDPH never had a rational

23  basis to establish the rules of August 2020.

24  Mr. Mahwikizi will show the death rates were

1  significantly lower than official numbers and that the

2  therapeutic drugs were available, including vaccines, for

3  more than six months, and they existed and had lowered

4  death rates across the board.

5          Additionally, Mr. Mahwikizi will show that CDC

6  said masks do not work.  In fact, CDC has begun

7  correcting by proclaiming that masks no longer need to be

8  worn outside.  Since the IDPH's rules, churches have

9  reopened in Illinois because of legal challenges on

10 Constitutional rights -- Constitutional grounds.  Since

11 the IDPH rules, restaurants have reopened with minimal

12 use of masks.

13         As stated, rideshare drivers qualify under the

14 IDPH August 2020 emergency rule that's running

15 independent except for businesses.  Thereby for IDPH

16 rideshare drivers can have their businesses penalized for

17 failure to comply through monetary fines.  This means for

18 sole proprietors the fine and penalty will not only be

19 against the business, but it will be the same person

20 running a rideshare business.  The same is true for

21 single-member LLCs where both single-member LLCs and sole

22 proprietors put their numbers on Schedule C on their

23 taxes.

24         For a temporary restraining order to stand

1 there are five basics points a plaintiff must prove.

2 One, an ascertainable right in need of protection.  In

3 this case, the right to practice religion with equal

4 protection rights, the Mahwikizi business suffers based

5 on how the IDPH rules are written, and the right to

6 speak, communication of religious beliefs.

7          Two.  The likelihood of success on merit.

8 Mr. Mahwikizi will contend that the state of the IDPH

9 should be measured under the strict standard because both

10 his first amendment right of religion and speech have

11 been violated by the rule and, two, even if the judge

12 goes with the IDPH's statement that it should be based on

13 rational basis, I will be able to address the rational

14 basis, the reasons why the plaintiff will also be able to

15 succeed based on past Supreme Court rulings, one

16 including reversing a Supreme Court of Tennessee decision

17 regarding railway.

18          Number three.  Irreparable harm in the absence

19 of injunctive relief.  Mr. Mahwikizi as the Supreme Court

20 of the United States cited this -- last year, I guess, in

21 the Roman Catholic Diocese of Brooklyn, New York versus

22 Andrew Cuomo, the Supreme Court found that, "To find

23 irreparable harm, the Supreme Court again assumed a broad

24 understanding of religious freedom in the Constitution

1  citing a precedent that holds that the loss of first

2  amendment freedoms for even a minimal period of time

3  unquestionably constitutes irreparable injury," in Elroy

4  versus Burns.

5           Number four.  The lack of an inadequate remedy

6  at law.  It is self-evident that this is the only remedy

7  that Mr. Mahwikizi could engage in to remedy the status

8  quo.

9           And, finally, number five.  The benefits of

10 injunction outweigh possible injury to the state.  As a

11 result thereof and per the Supreme Court ruling in Roman

12 Catholic Dioceses of Brookland versus Andrew Cuomo,

13 "Granting injunctive relief would not harm the public.

14 Even in a pandemic, the Constitution cannot be put away

15 and forgotten."

16          Just remember that the rules per the Governor

17 Pritzker's emergency declaration dictate that rideshare

18 drivers have windows open.  In a moment of summer or

19 spring, it's as if you're outside.  There's air

20 everywhere, Your Honor.  And for the CDC to say that you

21 no longer have to wear masks outside confirms that even

22 in a car where the windows are opened and going at

23 60 miles an hour it is as if you were outside and,

24 therefor, plaintiff can no longer have to require its

1  clients to put on a mask.

2          Plaintiff has had to refuse -- Mr. Mahwikizi

3  has had to refuse on two occasions clients who did not

4  have masks on.  On one occasion the woman threatened

5  Mr. Mahwikizi with mace, and the other occasion a clearly

6  on drugs person pointed a gun at Mr. Mahwikizi.

7          This not only is important for the TRO to be

8  given, rideshare drivers face risks on a daily basis

9  trying to maintain the IDPH rule.  And we all believe

10 based on what I've already -- Mr. Mahwikizi has already

11 said that if they allow continuously clients to come in

12 without masks they are subject to IDPH's penalty as is

13 written.  Whether they intend to or not is not a question

14 here, it's as the rules are written are they

15 Constitutional?

16          With that, I will -- I will yield and move

17 forward the process.

18              THE COURT:  Defense.

19              MS. HELFRICH:  Yes, Your Honor.

20          Nothing Mr. Mahwikizi has said here today

21 changes any of the arguments we set forth in our brief or

22 change any conclusions about his entitlement to a

23 temporary retraining order.  I will in a moment talk

24 about why he has no likelihood of success on the merits,

1   why he has no irreparable harm and about the balance of

2   the harm, but I want to address a couple of things that

3   he raised first.

4         First of all, I want to make clear that

5   Mr. Mahwikizi has never alleged that there is no rational

6   basis for this litigation.  This is something he invented

7   out of full cloth today.  His temporary retraining order,

8   his motion for a temporary retraining order stands or

9   falls based on his complaint and his motion, not stuff

10  that he throws at the court today in this hearing.

11        Second, he has contended that there's a

12  religious classification in the law.  I'll address that

13  when I get to my free exercise argument, so let me put

14  that one aside.

15        He has stated that he has had to refuse

16  clients, that one of his clients threatened him with mace

17  or threatened him with a gun.  That may be true, but

18  there's no sense in which that relates to any violation

19  of his free exercise privileges or his equal protection

20  privileges, both rights under the Constitution.  Those

21  issues -- it maybe the case that rideshare drivers face

22  dangerous conditions.  That might be true, but there's no

23  suggestion that he was somehow refusing to practice his

24  religion and that lead to those threats.  So, it's just

1  irrelevant.  It's just irrelevant to the claims that are

2  before the Court today.  Those claims, quite simply, are

3  free exercise violations and an equal protection

4  violation.

5           Now, let me talk for a moment if I can about

6  why those claims fail.  And I will address what

7  Mr. Mahwikizi says.  He's right.  There are five things

8  he has to prove.  He has a high burden here.  He has to

9  prove that he had --

10          THE REPORTER:  I'm sorry.  There was paper

11  rattling.  "He has to prove that."

12          MS. HELFRICH:  Sorry.

13          -- an ascertainable right in need of

14  protection, a likelihood of success on the merits,

15  irreparable harm in the absence of an injunction, lack of

16  an adequate remedy at law, and then because of the TRO

17  with notice and the same as a temporary injunction he

18  also has to show that the balance of harm or that the

19  benefits of -- quote.  "The benefits of granting the

20  injunction outweigh the possible injury that the state

21  might suffer as a result thereof."  That comes from

22  Granberg versus Didrickson.  That's 279 Ill. App. 3rd

23  886, 890, (1st District, 1996).

24          Now, he has to show all of those things.  If

 1  he fails to show even one of them, then he is not
 2  entitled to a TRO.  There are at least three that he
 3  cannot show.  The first element that he cannot show is a
 4  likelihood of success on the merits.  Now, setting aside
 5  what Mr. Mahwikizi said today and setting aside
 6  references to cases in which other plaintiffs in other
 7  circumstances have succeeded on first amendment
 8  challenges Mr. Mahwikizi does not succeed here.  He
 9  cannot.
10          The governing standard for a free exercise
11  challenge comes from Employment Division versus Smith,
12  494 U.S. 872 1990.  Under that case, a neutral law of
13  general applicability does not admit an exemption for
14  free exercise claims.  A neutral law of general
15  applicability is Constitutional if it is supported by a
16  rational basis.  So, that's Smith in addition to Illinois
17  Bible Colleges Association versus Anderson, a 7th Circuit
18  case from 2017.
19          Now, let's be clear.  If it is neutral and
20  generally applicable and supported by a rational basis,
21  then it is Constitutional even if it has the incidental
22  effect of burdening a religious practice.  That comes
23  from St. Johns United Church of Christ versus City of
24  Chicago, 7th circuit, 2007.  These are all in our briefs,

1 cited in our briefs.

2 So, the regulation has to meet three criteria,

3 and then it passes even if there is a burden on religious

4 practice. So, is the IDPH regulation neutral? Well,

5 it's neutral on its face. It doesn't single out any

6 religion. It doesn't single out any religious conduct.

7 Mr. Mahwikizi's contention that it singled out

8 Christian business owners is just false. It doesn't in

9 any way. It applies the same rule to all business

10 owners. There could well be business owners of other

11 faiths who also have to practice the same kind of -- have

12 the same practices in their faith. We don't know that.

13 That hasn't been discussed here, but there's no

14 distinction, religious distinction among religions in the

15 law.

16 The law does not single out any religious

17 conduct. It simply says that businesses have to require

18 their customers or other members of the public to wear

19 masks on the business premises. That's what it says.

20 There's no hidden discriminatory intent, and

21 Mr. Mahwikizi has not alleged in his complaint or in his

22 motion that there is any discriminatory intent behind

23 this law. So, it's neutral.

24 Is it generally applicable? Well, by its

1  terms it applies to, quote, "Any business, service,

2  facility, or organization open to the public or

3  employees."  So, that's Section (C)(2) of the regulation

4  which is 77 Ill. Admin. Code 690.50.

5          Neutral, generally applicable.  Does it have a

6  rational basis?  Again, by its terms, this law is aimed

7  at restricting and suppressing the novel coronavirus

8  SARS-CoV-2 that causes the coronovirus CV 2019

9  (COVID-19), a dangerously contagious and infectious

10 respiratory disease in the form of a pandemic or endemic.

11 That's, again, section C of the regulation.

12         So, that's the rational basis.  It's aimed at

13 stopping the spread of the coronavirus.

14         Now, that is a rational basis on its face.  I

15 mean we can sit here today and easily conclude that

16 slowing the spread of COVID-19 is rational, but we don't

17 have to because in Williams versus Trump, which is Case

18 Number 20 C 2495 from the Northern District of Illinois,

19 last year the court specifically held that slowing the

20 spread of COVID-19 in Illinois is a rational basis.

21         So, here we have a neutral law that is

22 generally applicable supported by a rational basis.  And

23 let's be clear.  Mr. Mahwikizi hasn't disputed any of

24 this.  He has not disputed that this law meets all of

1  these criteria.  What he has said instead or attempted,

2  we think he said that he has a hybrid claim that somehow

3  fits into the hybrid claim exception of Smith.  There is

4  some discussion in Smith of hybrid claims.  Well, his

5  claim doesn't fit.  First of all, the additional claim --

6  so, you have your free exercise claim and some other

7  claim.  The additional claim here isn't one of the types

8  of claims identified in Smith.  It's not about

9  communicating your religion.  Again that's something he

10 raised for the first time today.  It's not about parents

11 having the ability to raise their children in their

12 religion.  It doesn't fit with any of the additional

13 claims that were identified in Smith.  Moreover, under

14 the Illinois Bible Colleges Association case, you cannot

15 combine a free exercise claim with a meritless claim

16 about another Constitutional right to create a hybrid

17 claim.

18          So, Mr. Mahwikizi's equal protection claim, and

19 I'll explain in a moment why that's meritless, that

20 doesn't get him a hybrid claim.  If it did, every

21 plaintiff would just plead a second violation, and then

22 they'd all have hybrid claims.  So, it's obvious that

23 that doesn't create a hybrid claim.

24          And that's even if a hybrid claim would get him

1  some other type of relief.  Regardless, he doesn't have

2  one.

3       The second thing he argues or appears to argue

4  is that his claim meets Sherbert.  We assume he's

5  referring to Sherbert versus Verner, 374 US 398, (1963).

6  Well, maybe it does, maybe it doesn't meet Sherbert.  We

7  don't know.  It doesn't matter.  The Supreme Court

8  rejected Sherbert in the Smith case.  We're not doing

9  Sherbert anymore, so the balancing test of Sherbert

10 doesn't apply.

11      We are back to mutual, generally applicable,

12 supported by a rational basis.  The IDPH regulation

13 clearly meets all those criteria.  Mr. Mahwikizi's free

14 exercise claim cannot succeed.

15      The same is true of his equal protection

16 claim, and this is true for three separate reasons, each

17 of which is fatal to the claim.  First of all, the first

18 two are injury related, so bear with me.  First of all,

19 he does not allege and he cannot allege that businesses

20 and individuals are similarly situated for purposes of

21 equal protection.

22      Now, a plaintiff bringing equal protection

23 challenge has to allege that there are two groups being

24 treated differently and they are similarly situated,

1  which means in this context prima fascia identical in all

2  relevant respects.  That language comes from Racine

3  Charter One, Inc. versus Racine Unified School District.

4  423 F.3rd, 677, 680 (7th District 2005).  Again, it's in

5  our brief.

6          So, let me point out two ways in which

7  businesses and individuals not similarly situated.

8  First, businesses are in a better position to implement

9  policy for the business premises than an individual is.

10  In fact, a business almost always has to be the entity

11  that does that.  If the business owns the premise or

12  leases the premise or has control over the premise, as is

13  going to be the case with most businesses, then the

14  business has to set the policies for conduct on the

15  premises of the business.

16          Second, a business cannot be put in prison.  An

17  individual can.  I'm going to explain in just a second

18  why those two criteria are relevant and why the

19  difference between businesses and individuals makes them

20  not similarly situated.  To do that I need to talk about

21  the second reason the claim fails, which is that

22  Mr. Mahwikizi cannot possibly show that there is no

23  rational basis for the distinction between businesses and

24  individuals.

1          Under City of Cleburne versus Cleburne Living
2    Center, 473 U.S. 432, 1985, a regulation is presumed to
3    be valid and will be sustained if it is rationally
4    related to legitimate state interests.
5          So, this is the so-called rational basis
6    standard.  The rational basis standard applies to all
7    classifications in any law or regulation unless the
8    classification is based on race, alienage, national
9    origin, or a so-called suspect class.
10          That's not the case here.  Despite what
11   Mr. Mahwikizi has said, the classification in the IDPH
12   regulation is between businesses and individuals.
13   Nothing suspect about those characteristics.  As a result
14   under Cleburne, IDPH has wide latitude, that's the phrase
15   they use, wide latitude to make classification.
16          It is Mr. Mahwikizi's burden under equal
17   protection law to show that there is no conceivable
18   legitimate public interest that is furthered by this
19   classification.
20          And let's be clear.  We don't have to say or a
21   governing entity doesn't have to identify the rational
22   basis in the regulation or ahead of time.  Under St. Joan
23   Antida High School versus Milwaukee Public School
24   District, that's a 7th Circuit 2019, a classification is

1    generally valid as long as the rational basis is
2    plausible even if the legislature did not expressly
3    endorse it.
4            Well, here we don't see in the regulation that
5    IDPH specifically claimed what its rational basis for
6    distinguishing between individuals and businesses in
7    terms of enforcement.  Let's be clear.  It only refers to
8    enforcement.  But we can come up with at least two
9    rational bases.  If we had a lot of time I'd come up with
10   some more, but here's a few.
11           Back to the differences between businesses and
12   individuals.  Businesses set policy for business
13   premises.  So, for IDPH to focus its enforcement efforts
14   on the entities that are responsible for implementing the
15   policy that's going to help curb the spread of COVID-19
16   is completely rational.  That's a completely rational
17   thing for IDPH to do.
18           Second.  In the environment of this particular
19   pandemic, and let's hope it's the only pandemic we have
20   to deal with, that in this environment it is very
21   plausible that IDPH could have reasoned that enforcing
22   only businesses, which can't be put in jail and thereby
23   eliminating the possibility that anyone would go to jail
24   for violation of this regulation, which is ordinarily a

1   possibility for violation of an IDPH regulation.  That's

2   true before this pandemic before this regulation.  But

3   eliminating the possibility that anyone was going to end

4   up in jail for violating this regulation could be -- IDPH

5   could have concluded that that would be seen as less

6   heavy-handed, less authoritarian, more cooperative and

7   could have concluded that proceeding on that basis would

8   lead to more compliance with the regulation and less

9   antipathy towards IDPH.  More compliance means more masks

10  means less spread of COVID-19.

11          Those are two, two plausible basis for the

12  regulation.

13          There are, as I said, there are more, but I'm

14  not going to spend the time on more.  And it doesn't

15  matter whether those would be reasons that IDPH had in

16  mind when it made the classification.  It is perfectly

17  justified in making that classification.

18          Now, Mr. Mahwikizi might argue, well, I'm an

19  individual and I'm a business.  Well, I think we learned

20  from what he said earlier that that's not true because he

21  mentioned the multimember partnership.  But even so, even

22  so, the classification doesn't have to be perfect under

23  rational basis.  It can be over inclusive or under

24  inclusive.  That comes from St. Joan Antida, the case

1  that I mentioned before.

2        And there can also be a little bit of

3  inequality under the regulation.  That comes from City of

4  Chicago versus Shalala, 189 F.3d 598.  That's a 7th

5  Circuit from 1999.  That's the kind of latitude we're

6  talking about when we're dealing with the rational basis

7  standard.  If there's a good enough reason for deciding

8  between or distinguishing between these two categories

9  and they're not suspect category, it doesn't matter if

10  the state is perfect.  It's good enough.

11        So, whether Mr. Mahwikizi falls into a crack

12  between perfect fit and not a perfect fit, it doesn't

13  matter.  Under equal protection law that has no bearing

14  on the Constitutionality of this provision.  So, that is

15  the second reason why Mr. Mahwikizi's claim is not going

16  to succeed.

17        There is a rational basis for this

18  legislation -- for this distinction between businesses

19  and individuals, and the regulation, therefor, does not

20  violate equal protection.

21        There's a third reason which is Mr. Mahwikizi

22  has no standing to bring this claim.  He is an

23  individual.  Whatever he says about his business he,

24  Mr. Mahwikizi, the plaintiff in this case, is an

1  individual.  And individual faces no enforcement

2  penalties, no fines, no judgment, nothing under this

3  regulation.  He faces no punishment.  It says flat out in

4  Section D of the regulation that an individual cannot be

5  penalized for failure to enforce on behalf of a business.

6  So, he faces no sanction here.  There's no harm, no

7  injury in fact that would give rise to the standing.

8          In addition, and this is related but it's

9  distinct, as an individual he's not a member of the class

10  that he alleges is being treated differently.  Under

11  Srail versus Village of Lysle, which 588 F.3rd at 943,

12  under equal protection plaintiff is required to show

13  disparate treatment of a class to which he or she

14  belongs.  Mr. Mahwikizi isn't a business.  He doesn't

15  belong to the class of business.  He, therefor, cannot

16  claim, cannot bring an equal protection challenge.

17          So, those are three separate reasons:  Not

18  similarly situated, there exists a rational basis, and no

19  standing.

20          That's under the equal protection claim he's

21  not likely to proceed on the merits.  So, these two

22  theories, free exercises, equal protection, neither has

23  any likelihood of success on the merits.  That alone

24  torpedos his motion for a TRO.

1            But then we get to irreparable harm.

2    Mr. Mahwikizi has a big problem here because, as I just

3    pointed out, this regulation can't be enforced against

4    him.  He faces no penalty here.  He faces no injury, no

5    threat of injury, no theoretical injury from enforcement

6    of this legislation.

7            Even if there were a threat, he still hasn't

8    shown that he faces irreparable harm.  He has not alleged

9    anywhere that he has ever had to refuse a ride to a

10   passenger in need because they weren't wearing a mask.

11   He's never alleged that.  He's never alleged, for

12   example, that he couldn't provide that person with a mask

13   and transported the person that way.  But more to the

14   point, he's never alleged that such a person exists.  He

15   presented no facts which would suggest that he's

16   imminently going to face that possibility.  He simply

17   hasn't done it.

18           The regulation's been in effect since August.

19   If this were a real issue that he faced you'd think he

20   could be able to come up with some facts to show that

21   this happened.  An example he gives about refusing a ride

22   to someone, is he saying those were people who were in

23   need and couldn't -- and he wasn't allowed?  Is he saying

24   that every passenger he picks up he's required to pick up

1  because of the Good Samaritan principle?  I'm not sure if
2  that's what he's saying, but, regardless, he has not
3  adequately alleged that passengers in need actually
4  exist.  His harm here on that score is entirely
5  speculative, and speculative harm will not support
6  equitable relief.
7          Even if he could convince the Court that he
8  actually would have to refuse passengers under this
9  regulation, he doesn't for another reason.  The
10 regulation only requires that a business makes -- or
11 anybody makes reasonable effort to insure compliance.
12 This regulation -- what Uber requires him to do, what the
13 CDC requires him to do based on their regulations on
14 conveyance, I'm not talking about that.  He cited at
15 least two other rules that requires him to require his
16 customers to wear a mask.  But if he's talking about
17 having to leave people on the side of the road who are in
18 need because they don't have a mask, he has not even
19 attempted to show why that doesn't fit within the
20 reasonable effort exception or whether it would be an
21 unreasonable effort.  He hasn't done it.  He hasn't shown
22 any harm at all.  He can't because the regulation can't
23 be enforced against him, and he certainly can't show
24 irreparable harm.  So, likelihood of success, no

1  likelihood of success, no irreparable harm.  TRO is done

2  on those two.

3          Then we get to the balance of harm.  It's his

4  job again to show that the benefit of the injunction

5  outweighs the harm to the state and to the public.

6  Again, he has not done it.  First of all, there's no

7  benefit to him from this injunction.  He's not subject to

8  penalties under this rule, so there's zero on that side

9  of the scale.  The scale, keep in mind, has to be heavier

10 on his side.  There is zero on his side.

11         On the other side, the injunctions he's asking

12 for today in his TRO motion is pretty sweeping.  He's

13 phrased it so that IDPH can't keep a mask mandate going.

14 It has to stop.  It can't review this mask mandate.  It

15 can't extend it, re-enact it, none of that for the

16 duration of the pandemic.  So, he's saying take away a

17 critical tool to stopping the spread of COVID-19 in the

18 middle of the pandemic, and he's saying that when there

19 is zero on his side of the balance.  Zero.

20         He cannot show that the balance of harm favors

21 him, and that is a third separate independent reason why

22 his motion fails.

23         I go back to where I started.  A temporary

24 restraining order, a preliminary injunction, these are

```
1  extraordinary remedies, and they are required when there
2  is an extreme emergency and serious harm would result.
3  No harm results from this regulation to Mr. Mahwikizi.
4  There is simply no ground for issuing a TRO or a
5  preliminary injunction in this matter.
6              Thank you, Your Honor.
7              THE COURT:  Thank you.
8              MR. MAHWIKIZI:  Your Honor, if can I respond.
9              THE COURT:  Sure.
10             MR. MAHWIKIZI:  The question of the rational
11 basis.  I believe counsel is mistaken in error.
12 Mr. Mahwikizi, he's that sole proprietor, not a member of
13 a multimember LLC.  I just said that --
14             THE REPORTER:  I'm sorry, counsel -- I mean
15 Mr. --
16             MR. MAHWIKIZI:  Sure.  My apologies.
17             I'm saying Mr. Mahwikizi is a sole proprietor
18 and not a member of a multimember LLC.  And, as counsel
19 just said, if the IDPH or maybe Your Honor can write in
20 the order whatever finding comes out that rideshare
21 drivers have a right to refuse IDPH's emergency rules and
22 will not face either jail time or a fine, great, that's a
23 new policy.  But IDPH does not announce that as it comes
24 to sole proprietors, and that's the big issue because
```

1 sole proprietors, individuals, can make a claim on behalf
2 of their sole proprietorship. It's not an LLC, so I
3 don't need a lawyer to bring in their name.
4          But let's go to the rational basis arguments
5 that counsel just stated. First of all, I believe based
6 on my claim this -- which should meet the strict, the
7 strict review versus the rational review, but counsel
8 said that it's a neutral law or general applicability
9 that's supported by rational basis. The act of refusing
10 service to people who don't have masks goes contrary to a
11 crucial part of the Christian religion which is to give
12 service to those in need.
13          I myself am a rideshare driver. I don't make
14 a million dollars a year, so, no, I cannot provide masks
15 to people who ride my cab. I can't. I just can't. So,
16 when it says it's a neutral law of general applicability
17 imagine just like in Braunfeld versus Brown, 1961 in
18 Pennsylvania was still saying Sunday was a rest day
19 impacting the Jewish community who takes Saturdays off if
20 they had said, well, Saturday everyone has to work.
21 That's general. That's neutral law. However, it
22 specifically indirectly applies to such a class of that
23 Jewish community that adheres to the Saturday as a
24 Sabbath. So, this rule specifically goes against the

1  crux of Christianity which is to give help to those in

2  need.  Not just the poor, but those in need.

3        Now, if we can go to the rational basis, those

4  in the 12(B)(6) motion applicability that counsel just

5  tried to make a case for, in Borden's Farms Products

6  versus Baldwin, as in Nabia versus New York, the Supreme

7  Court explained that the rational basis is a presumption

8  of fact of the existence of factual conditions supporting

9  the legislation.  It is a rebuttal presumption, not a

10  conclusive presumption.

11        MS. HELFRICH:  I'd like to object here.

12  Mr. Mahwikizi never made any allegation that there wasn't

13  a rational basis for any of the provisions.  He didn't

14  make it with regard to his free exercise claim, he didn't

15  make it with regard to his equal protection claim.

16  Never.  It's no where in his complaint, it's no where in

17  his motion.  I don't think he should be arguing rational

18  issues or attempting to create factual issues where none

19  exist and he hasn't alleged them.

20        MR. MAHWIKIZI:  If counsel remembers,

21  plaintiff did not respond to your answer because time was

22  critical to get this hearing done.  So, consider this not

23  just an argument, it's a response to your answer.  That

24  it's not written, show me a law that says I cannot.

1        I would like to continue with this, Your

2   Honor, if you're agreed because this is the only

3   opportunity that I have to make this argument.

4        THE COURT:  Go ahead.

5        MR. MAHWIKIZI:  Thank you.

6        In Borden's Farms Products versus Baldwin, as

7   in Nabia versus New York, the Supreme Court explained

8   that rational basis is a presumption of fact of the

9   existence of actual conditions supporting the

10  legislation.  It is not -- it is a rebuttal presumption,

11  not a conclusive presumption or a rule of law which makes

12  legislative action invulnerable to Constitutional

13  assault, nor is such an immunity achieved by treating any

14  defensible conjecture as enough to repel attack.

15       When the law is called in question, there is a

16  presumption of the existence of that state of facts, and

17  one who has failed the classification must carry the

18  burden of showing by resort of common knowledge or other

19  matters which may be judicially noticed or other

20  legitimate proof that the action is arbitrary.  The

21  principle that a state has a broad discretion and

22  classification in the exercise of its power for

23  regulation is constantly recognized by the Supreme Court

24  they said.  But still the statute may show on its face

1    that it's arbitrary or, after a full showing of facts or

2    opportunity to show them, it may be found that the burden

3    of establishing that classification with that -- is

4    without rational basis has not been sustained, but it's

5    crucial that there's an opportunity to show those facts.

6           The Rule 12(B)(6) does not allow courts to

7    dismiss lawsuits, even rational basis cases, which make a

8    plausible claim for relief.  Judges do not dismiss

9    rational basis cases just because the government claims

10   without any proper or actual evidence that a law is

11   rational.  The United Supreme Court even reversed a

12   decision of the Tennessee Supreme Court on the ground

13   that a person should have a chance to prove that a law

14   that once may have been rational had become obsolete or

15   irrational.

16          And when we go down to the restricted novel --

17   the rational basis that counsel outlined of restricting a

18   novel virus that is dangerous and killing people,

19   plaintiff will show through his request for documents,

20   that the data, some of it the plaintiff is already aware

21   of through a Freedom of Information Act that will be

22   included in the amended complaint, the data of infection

23   numbers that the state has announced are defective

24   because they do not include what the threshold count of

1  the PCR test was.  And IDPH has admitted, their own

2  attorneys have admitted publicly through a FOIA action

3  that they do not have those counts.  And, so, to build a

4  rational basis on this data that is, at best, inaccurate

5  as well as the director of the IDPH, Dr. Ezike's

6  explanation on what the classification of a death of

7  COVID is which is so liberal even given the squirrel that

8  fell down a tree got tested with a count of 40 threshold

9  would classify as a COVID death.

10         let's go the effect that the St John's case

11  that counsel announced.  To plaintiff, this is not an

12  incidental effect.  My whole religion is the reason I'm

13  here.  And, so, I do not refuse rides to people who come

14  to my car.  Mr. Mahwikizi has accepted half naked clients

15  who were drunk and his friends were trying to get them

16  home.  Their friend came with them to take care of them,

17  but he did not refuse service based on appearance,

18  religion, race, or any of that.  He's even given rides

19  during the riots of last year.  Mr. Mahwikizi accepted

20  rides from bleeding clients, he accepted rides from

21  pregnant ladies going to the hospital because they're

22  about to deliver.

23         Something that most people don't understand is

24  rideshare drivers are now being called before the

1 ambulance because we're going to get there faster and get

2 them where they're going faster than if they had to wait

3 for a 911 call, service call. So, this rule that IDPH

4 says that we have to refuse service strikes at the heart

5 of the good Samaritan principal. The Good Samaritan

6 principle is one of the key identifying aspects of

7 Christianity that none of the other major religions have.

8 They do have that you should help the poor or you should

9 help people in your plan or in your faith, but

10 Christianity specifically with Jesus Christ's teachings

11 says you should help anyone. Period. There's no ifs.

12 And that is what Mr. Mahwikizi is doing. And, in fact,

13 Mr. Mahwikizi has already raised this with counsel in

14 Mahwikizi versus Pritzker in his emergency orders that he

15 merely cannot say no to people coming into his car.

16      So, the question becomes if counsel says

17 Mr. Mahwikizi as a sole proprietor does not face any jail

18 time or fines for violating this rule, Mr. Mahwikizi

19 would like that in writing so he can inform the members

20 of his association of rideshare drivers in Chicago that

21 we are allowed to accept anybody. And the rules do not

22 state that. The rules actually threaten either jail time

23 for the individual or a fine for the sole proprietorship.

24 Uber and Lyft do not bare any exposure because their

1  agreement says we're not employees, we're just businesses

2  contracting with them.  Therefor, the question here

3  becomes, and why the TRO is so important, it is so vague

4  to 60,000 rideshare drivers in Chicago that some of us

5  have stayed home.

6          Prices for clients have gone up.

7  Mr. Mahwikizi's religion is being impeded although

8  counsel stated that doesn't matter.  Mr. Mahwikizi's

9  business as a sole proprietorship qualifies under the

10  emergency rules, but counsel says that we won't get

11  punished anyways.  All of that is confusing and goes to

12  the irrationality of this law or this rule.

13          And plaintiff reiterates the need for a TRO

14  until this is figured out through an evidentiary process,

15  and it will not hurt the state because it's a car.  It's

16  not Wal-Mart where 60,000 people come in.  It's a car,

17  one person at a time, windows down.  The driver may wear

18  a mask, but the client and her child or somebody else may

19  not.  Some come in with a mask and then take it off

20  afterward.  For example, I'll pick up -- Mr. Mahwikizi

21  will pick up a client in Indiana which has no mask

22  requirement and drive him to Illinois where he puts the

23  mask on once they get past the Illinois boarder.  Does

24  that affect an interstate flag?  I don't know, but I

```
 1   believe the TRO is needed for this case for this
 2   individual to go through an evidentiary process which
 3   will prove that there was no rational basis.  And the
 4   rational basis there even was, Judge, I believe there
 5   was, it is irrational and it is obsolete at this time.
 6              THE COURT:  All right.  Thank you.  Counsel,
 7   is there anything else?
 8              MS. HELFRICH:  I'd just like to make two
 9   points.  Again I reiterate if Mr. Mahwikizi challenged
10   the rational basis for this regulation he hasn't plead
11   it, he hasn't mentioned it in his motion, and, therefor,
12   he has failed to make a showing that he's likely to
13   succeed on the merits.  Completely failed to make a
14   showing that would entitle him to a TRO.
15              Secondly, he thinks the regulation is unclear.
16   I don't know what's unclear about it.  It says no
17   individual will face enforcement on behalf of the
18   business.  No individual even if the individual is the
19   owner of the business.  That's what the regulation says.
20   That's the literal text.  That's not my gloss on it,
21   that's what it says.  So, in addition, Mr. Mahwikizi has
22   never --
23              MR. MAHWIKIZI:  (Inaudible.)
24              MS. HELFRICH:  Excuse me, Mr. Mahwikizi.
```

1    He has never previously mentioned clarity of

2    the regulation as forming any part of his claim, so this

3    is entirely new today.  Again, he's not made a showing

4    with regard to that issue.

5        I just want to emphasize that there's a

6    difference between a regulation that has an effect, an

7    incidental effect on religious practice under Smith which

8    is allowed under Smith and a regulation that targets

9    religions practice.  You just cannot look at this

10   regulation and say that it targets religions practice.

11   It does not target religious practice.

12       When he talked about Saturday closing laws or

13   Sunday closing laws, those are laws that could arguably

14   be viewed as targeting specific religions.  That's not

15   what we're dealing with here.  We're dealing with a

16   generally applicable law that's trying to stop the spread

17   of COVID-19.  It is not -- it is not subject to strict

18   scrutiny.  It is not a religious classification.  It is

19   not a targeting religion.  It's neutral.

20       MR. MAHWIKIZI:  If I can respond.

21   Miss Helfrich interrupted me and I gave her the floor

22   when she did.  Anyway.

23       This targets the underpinning work of what

24   Christianity means.  When she says this is generally

1   applicable, it goes against -- it literally mandates

2   Christians to refuse service.  It doesn't get better than

3   that in restricting religion.  Whether they say it or

4   not, this is the effect.  That's why there's no drivers

5   on the road.  They're scared they're going to be fined or

6   put in jail.

7        Now, if the law -- if the rules do not apply to

8   sole proprietorships, which the IRS recognizes as

9   businesses, then please have the IDPH say it because as

10  it's written, it's businesses.  And the IDPH -- and sole

11  proprietors are business people.  They own businesses.

12       I don't know how else I can say it, Your

13  Honor, that because I forfeited my chance to write this

14  in an answer, a response to their answer means that the

15  court cannot consider it, that fine.  We'll see what a

16  reviewing court says, but that is still -- it's

17  prejudicial to me if that was the case.

18       The only thing I'll ask Your Honor after

19  hearing the arguments is that the order be issued -- not

20  be issued on a Friday.  I've submitted a Supreme Court

21  rule amendment proposal for a 307(B) appeal.  Because

22  this is issued on a Friday, it only gives the plaintiff

23  Monday to turn everything else in.  If it can be

24  submitted on a Monday to Wednesday or Thursday, that

```
 1  would be great because it did actually allow us so many
 2  days to do a 307(B) appeal if it's submitted before
 3  the...
 4              THE COURT:  All right.  Thank you.  The Court
 5  will take it under advisement.  You will be notified when
 6  I have a decision.  Thank you for your arguments.
 7              MS. HELFRICH:  Thank you, Your Honor.  May I
 8  raise two other items?  Small items.
 9              THE COURT:  Not related to argument.  I'm done
10  listening to argument.
11              MS. HELFRICH:  No, not related to argument.
12              THE COURT:  Okay.  Go ahead.
13              MS. HELFRICH:  On Wednesday we filed a motion
14  to dismiss and a motion to stay discovery pending that
15  motion, and I just wanted to ask if we could set briefing
16  schedules on those today.
17              THE COURT:  When are they up for presentment?
18              MS. HELFRICH:  Well, I asked that they be up
19  for presentment today, but I didn't get a response.
20              THE COURT:  Got it.  Go ahead.
21              MR. MAHWIKIZI:  TRO decision and go through
22  any pending appeal process.  That might take ten days
23  before we go to the next phase.  I would appreciate it.
24  I'm still pro se here.  I'd ask that.
```

```
 1              MS. HELFRICH:  I have no objection to a long
 2    briefing schedule if that's what Mr. Mahwikizi wants to
 3    do on the motion to dismiss to accommodate an appeal he
 4    might take.
 5              MR. MAHWIKIZI:  No, I'm asking that -- I'm
 6    asking that that discussion not take place now and allow
 7    the judge to make a decision on the TRO without any --
 8              THE REPORTER:  "Without any?"  I didn't hear,
 9    Mr. Mahwikizi.  You said without any?
10              MR. MAHWIKIZI:  Any preconceived notion of
11    where the judge will rule.
12              THE COURT:  I wasn't aware that there had been
13    any motions that have been filed, so we'll just enter a
14    briefing schedule after I make a determination on the
15    TRO.
16              MS. HELFRICH:  One final request, Your Honor.
17    Our motion to stay discovery until the motion to dismiss
18    was also filed on Wednesday, and I understand you'll set
19    a briefing schedule after you rule on the TRO.  I'd like
20    to make an oral motion for stay of discovery pending the
21    ruling on that motion.
22              MR. MAHWIKIZI:  Your Honor, we're two days
23    away from the deadline.  We've got three days.  I'm not
24    sure why they're looking for a stay.
```

1          MS. HELFRICH:  We're looking for -- go ahead.

2          THE COURT:  The issue of whether or not

3  discovery should be stayed will be made after I have a

4  chance to look at the motion.  So, as far as -- I'm not

5  ruling on anything right now.

6          MS. HELFRICH:  Okay.

7          THE COURT:  The only thing you need to do is

8  submit an order indicating that the court is taking this

9  under advisement, and I will notify you when I have made

10  a decision.  The motions as far as I know were not up for

11  presentment.  I have seen nothing, but we will enter and

12  continue them since you're telling me they've been filed.

13          MS. HELFRICH:  Thank you, Your Honor.

14          THE COURT:  Thank you.  Have a good day.

15          MR. MAHWIKIZI:  Your Honor.

16          THE COURT:  Yes?

17          MR. MAHWIKIZI:  I said thank you.

18          THE COURT:  Thank you.

19            (Ending time - 11:15 a.m.)

20     *  *  AND FURTHER DEPONENT SAITH NOT  *  *

21

22

23

24

```
1   STATE OF ILLINOIS )

2                     ) SS:

3   COUNTY OF C O O K )

4           I, CHERYL LYNN MOFFETT, Certified Shorthand

5   Reporter No. 084-002218 in and for the County of Cook and

6   State of Illinois, do hereby certify that I caused to be

7   reported in shorthand and thereafter transcribed the

8   foregoing transcript of proceedings.

9           I further certify that the foregoing is a true

10  and correct transcript of my shorthand notes so taken as

11  aforesaid; and, further, that I am not counsel for nor in

12  any way interested in the outcome thereof.

13          I further certify that this certificate

14  applies to the original signed IN BLUE and certified

15  transcripts only.  I assume no responsibility for the

16  accuracy of any reproduced copies not made under my

17  control or direction.

18

19          IN TESTIMONY WHEREOF, I have hereunto set my

20  hand this 3rd day of May, 2021.

21

22

23  _____

24  CHERYL LYNN MOFFETT
```

# EXHIBIT (5)

May 27, 2021

Harvey Police Department                     Riverdale Police Department
15301 Dixie Hwy,                             725 W 138th St
Harvey, IL 60426                             Riverdale, IL 60827
(708) 331-3030                               (708) 841-2203


Dear Harvey Police Dept Chief,               Dear Riverdale Police Dept Chief,

This letter is written to make a complaint regarding a police stop incident that occurred on May 26th at, or around, 12PM Central near the intersection of 159th St & Halstead.

My name is Justin Mahwikizi and from time to time I provide transportation services in the form of Rideshare services to the public.

On May 26th at 11:41AM; I picked up a customer, Mr. K (Not releasing name because customer was a minor between the ages of 16-18) who had a destination of the River Oaks Mall.

At, or around 12:00PM Central time, an unmarked police car (silver sedan with police plates starting with MP) pulled my car over. Two police officers exited, one tall in his early 30s, and the second one much shorter in what appears to have been in his mid 40s. Both officers were African Americans; my customer was an African American, as I am. Race did not appear to be the issue in this stop.

Tall officer came by the driver side and asked for my ID as the driver. I gave it to him. He checked with the police station over a portable radio communication device. I was cleared. Tall Officer then proceeded to ask my customer Mr. K if he had any weapons on him. Mr. K answered in the negative. Tall Officer then proceeded to berate Mr. K. Tall Officer told us that we were stopped because of the type of mask Mr. K was wearing. CDC mask guidance still asks local authorities that masks must still be worn in transportation settings. Tall officer said the mask Mr. K was wearing made him look like he "was going to commit a robbery on the driver". I, as the driver, assured the officers that I felt safe with Mr. K and nothing of the sort was going to happen. Mr. told the officers that the mask he had on was the same mask that he was forced to wear at school as well. CDC mask guidance still asks local school districts to enforce a mask mandate in schools.

Tall officer continued to berate Mr. K and proceeded to go on the passenger rear door. Tall Officer opened the passenger rear door and asked Mr. K for his ID. Mr. K provided his ID still saying his mask was accepted at school. Tall officer gave Mr. K's ID to Short Officer to check with station over radio. Tall officer asked Mr. K again if he had any weapons on him. Mr. Said "No". Tall Officer proceeded to manually feel around Mr. K's waist. Mr. K, a minor, was visibly shaken. I counseled Mr. K to remain calm and Mr. K listened to me after looking like he was about to run away due to his fear. Tall officer then

proceeded to physically remove Mr.K's mask. Mr. K, a minor, was traumatized. His offense and the reason we were given for being pulled over was the mask Mr. K had to wear in the RideShare ride, and had to wear at his school. Tall officer found no weapon on Mr. K's person.

Moments later, Short Officer gave Mr. K his ID back. He was cleared. Tall Officer then asked Mr. K to not wear that mask again and only manually use it to just cover his mouth. The officers proceeded into their unmarked silver sedan and waved to us to leave.

I proceeded to continue and providing the transportation service to Mr. K and dropped him off at the River Oaks Mall. Mr. K was visibly shaken and traumatized. His only crime was wearing a mask that the CDC required him to wear during a transportation settings and during his school. Attached is a mask like the one Mr. K had on.

I was aware that the actions of the tall officer went against my own constitutional rights. Specifically the 4th Amendment against search of a place of business (my car) without probable cause. The mask worn by Mr. K was not a sufficient cause to suspect Mr. of robbery and carrying firearms. When Tall officer opened my car to search Mr. K's waist line while Mr. K was seating in the car, that became a violation of my 4th Amendment rights.

However, there will be no legal action against your police department. This is so because "But for" the recommendations of the CDC and the implementation of local authorities of the CDC's guidance on mask policy, Mr. K who belongs to a group that has been extraordinarily strong against Covid-19, would not have believed he needed to wear a mask during his ride to the mall.

Therefore, I will be applying the Constitutional violations to the party that caused it, Cook County Health Department, and the CDC. This letter is to inform of the event, and ask that you inform officers in your police departments to not use masks as a cause to stop vehicles and conduct searches. Especially against minors. The silver sedan was unmarked and therefore based on the location of the stop, I could only conclude that those officers were with the Harvey or Riverdale Police Department. In fact after the incident, the police officers made a U-Turn to go back towards Harvey/Riverdale. Therefore I address this letter to both Harvey and Riverdale Police Departments.

Masks should not be a pretext for police engagement in traffic stops. Thank you for your attention. I am thankful Mr. K listened to me and did not act rashly. Otherwise, This incident could have gone very wrong for all parties involved.

Justin Mahwikizi

# EXHIBIT (6)

# CDC EXPEDITED FREEDOM OF INFORMATION ACT REQUEST

Request submitted on **May 27, 2021**.

The confirmation ID for your request is **221631**.

The confirmation ID is only for identifying your request on FOIA.gov and acts as a receipt to show that you submitted a request using FOIA.gov. This number does not replace the information you'll receive from the agency to track your request. In case there is an issue submitting your request to the agency you selected, you can use this number to help.

## Contact information

**Name**
Justin Mahwikizi

## Your request

Please provide any mention, publication, study, email, text, declaration by the CDC that shows that for Covid19; Active immunity from natural antibodies by direct infection is inferior to Vaccine induced antibodies from Pfizer, Moderna, JNJ, other Emergency Use approved vaccines. Please provide any study that shows that people with natural immunity have to keep wearing masks versus people with vaccine induced antibodies.

# Request expedited processing

## Expedited processing
yes

## Justification for expedited processing
The requester is a person primarily engaged in disseminating information, and with confusion on discriminating behavior taking place by the public to segregate those who took vaccine and tbose who have survived Covid through natural immunity; there is an urgency to inform the public concerning actual or alleged Federal Government activity as it related to local officials interpretating CDC guidance between vaccinated people and natural immunity people.

# EXHIBIT (7)

f (https://www.facebook.com/sharer/share.php?u=https://www.americanheritage.com/plessy-v-ferguson&t=Plessy%20v.%20Ferguson)

🐦 (http://twitter.com/share?text=Plessy%20v.%20Ferguson&url=https://www.americanheritage.com/plessy-v-ferguson)

✉ (mailto:?t=Plessy%20v.%20Ferguson&Body=https://www.americanheritage.com/plessy-v-ferguson)

A-A+

🖨

*The Birth of Jim Crow*

---

## C. Vann Woodward (/users/c-vann-woodward)

**April 1964**   (/content/april-1964) │ **Volume** 15, **Issue** 3

| « | 1 | 2 | 3 | 4 | 5 | 6 | » |

View full article

In the spring of 1885, Charles Dudley Warner, Mark Twain's friend, neighbor, and onetime collaborator from Hartford, Connecticut, visited the International Exposition at New Orleans. He was astonished to find that "white and colored people mingled freely, talking and looking at what was of common interest," that Negroes "took their full share of the parade and the honors," and that the two races associated "in unconscious equality of privileges." During his visit he saw "a colored clergyman in his surplice seated in the chancel of the most important white Episcopal church in New Orleans, assisting in the service."

It was a common occurrence in the i88o's for foreign travellers and northern visitors to comment, sometimes with distaste and always with surprise, on the freedom of association between white and colored people in the South. Yankees in particular were unprepared for what they found and sometimes estimated that conditions below the Potomac were better than those above. There was discrimination, to be sure, and Negroes were often excluded from first-class public accommodations—as they were in the North. But that was done on the responsibility of private owners or managers and not by requirement of law. According to the Supreme Court's decision in the Civil Rights Cases of 1883 the federal law gave no protection from such private acts.

Where discrimination existed it was often erratic and inconsistent. On trains the usual practice was to exclude Negroes from first-class or "ladies' " cars but to permit them to mix with whites in second-class or "smoking" cars. In the old seaboard states of the South, however, Negroes were as free to ride first class as whites. In no state was segregation on trains complete, and in none was it enforced by law. The age of Jim Crow was still to come.

↑

The first genuine Jim Crow law requiring railroads to carry Negroes in separate cars or behind partitions was adopted by Florida in 1887. Mississippi followed this example in 1888; Texas in 1889; Louisiana in 1890; Alabama, Arkansas, Georgia, and Tennessee in 1891; and Kentucky in 1892. The Carolinas and Virginia did not fall into line until the last three years of the century.

Negroes watched with despair while the legal foundations for the Jim Crow system were laid and the walls of segregation mounted around them. Their disenchantment with the hopes based on the Civil War amendments and the Reconstruction laws was nearly complete by 1890. The American commitment to equality, solemnly attested by three amendments to the Constitution and by elaborate civil rights acts, was virtually repudiated. The "compromise of 1877" between the Hayes Republicans and the southern conservatives had resulted in the withdrawal of federal troops from the South and the formal end of Reconstruction. What had started then as a retreat had within a decade turned into a rout. Northern radicals and liberals had abandoned the cause: the courts had rendered the Constitution helpless; the Republican party had forsaken the cause it had sponsored. A tide of racism was mounting in the country unopposed.

The colored community of New Orleans, with its strong infusion of French and other nationalities, was in a strategic position to furnish leadership for the resistance against segregation. Many of these people had culture, education, and some wealth, as well as a heritage of several generations of freedom. Unlike the great majority of Negroes, they were city people with an established professional class and a high degree of literacy. By ancestry as well as by residence they were associated with Latin cultures at variance with AngloAmerican ideas of race relations. Their forebears had lived under the Code Noir decreed for Louisiana by Louis XIV, and their city faced out upon Latin America.

When the Jim Crow car bill was inirocluced in the Louisiana legislature, New Orleans Negroes organized to fight it. Negroes were still voting in large numbers, and there were sixteen colored senators and representatives in the Louisiana General Assembly. On May 24, 1890, that body received "A Protest of the American Citizens' Equal Rights Association of Louisiana Against Class Legislation." An organization of colored people, the association protested that the pending bill was "unconstitutional, unamerican, unjust, dangerous and against sound public policy." It would, declared the protest, "be a free license to the evilly-disposed that they might with impunity instdt, humiliate, and otherwise maltreat inoffensive persons, and especially women and children who should happen to have a dark skin."

On July 10, 1890, the Assembly passed the bill, the governor signed it, and it became law. Entitled "An Act to promote the comfort of passengers," the new law required railroads "to provide equal but separate accommodations lor the white and colored races." Two members of the Equal Rights Association, L. A. Martinet, editor of the New Orleans Crusader , and R. L. Desdunes, placed heavy blame on the sixteen colored members of the Assembly for the passage of the bill. According to Martinet, "they were completely the masters of the situation." They had but to withhold their support for a bill desired by the powerful Louisiana Lottery Company until the Jim Crow bill was killed. "But in an evil moment," he added, "our Representatives turned their ears to listen to the golden siren," and "did so for a 'consideration.'"

Putting aside recriminations, the Crusader declared: "The Bill is now a law. The next thing is what we are going to do?" The editor spoke testily of boycotting the railroads, but concluded that "the next thing is…to begin to gather funds to test the constitutionality of this law. We'll make a case, a test case, and bring it before the Federal Courts." On September i, 1891, a group of eighteen men of color formed a "Citizens' Committee to Test the Constitutionality of the Separate Car Law."

Money came in slowly at first, but by October 11, Martinet could write that the committee had already collected $1,500 and that more could be expected "after we have the case well started." Even before the money was collected, Martinet had opened a correspondence about the case with Albion Winegar Tourgee of May ville, New York, and on October 10 the Citizens' Committee formally elected Tourgée "leading counsel in the case, from beginning to end, with power to choose associates."

This action called back into the stream of history a name prominent in the annals of Reconstruction. Albion Tourgée was in 1890 probably the most famous surviving carpetbagger. His fame was due not so much to his achievements as a carpetbagger in North Carolina, significant though they were, as to the six novels about his Reconstruction experiences that he had published since 1879. Born in Ohio, of French Huguenot descent, he had served as an officer in the Union Army, and moved to Greensboro, North Carolina, in 1865 to practice law. He soon became a leader of the Radical Republican party, took a prominent part in writing the Radical Constitution of North Carolina, and served as a judge of the superior court for six years with considerable distinction. He brought to the fight against segregation in Louisiana a combination of zeal and ability that the Citizens' Committee of New Orleans would have found it hard to duplicate. They had reason to write him, "we know we have a friend in you &: we know your ability is beyond question." He was informed that the committee's decision was made "spontaneously, warmly, & gratefully."

Tourgée's first suggestion was that the person chosen for defendant in the test case be "nearly white," but that proposal raised some doubts. "It would be quite difficult," explained Martinet, "to have a lady too nearly white refused admission to a 'white' car." He pointed out that "people of tolerably fair complexion, even if unmistakably colored, enjoy here a large degree of immunity from the accursed prejudice....To make this case would require some tact." He would volunteer himself, "but I am one of those whom a fair complexion favors. I go everywhere, in all public places, thotigh well-known all over the city, & never is anything said to me. On the cars it would be the same thing. In fact, color prejudice, in this respect does not affect me. But, as I have said, we can try it, with another."

Railroad officials proved surprisingly co-operative. The first one approached, however, confessed that his road "did not enforce the law." It provided the Jim Crow car and posted the required sign, but told its conductors to molest no one who ignored instructions. Officers of two other roads "said the law was a bad and mean one; they would like to get rid of it," and asked for time to consult counsel. "They want to help us," said Martinet, "but dread public opinion." The extra expense of separate cars was one reason for railroad opposition to the Jim Crow law.

It was finally agreed that a white passenger should object to the presence of a Negro in a "white" coach, that the conductor should direct the colored passenger to go to the Jim Crow car, and that he should refuse to go. "The conductor will be instructed not to use force or molest," reported Martinet, "& our white passenger will swear out the affidavit. This will give us our habeas corpus case, I hope." On the appointed day, February 24, 1892, Daniel F. Desdunes, a young colored man, bought a ticket for Mobile, boarded the Louisville & Nashville Railroad, and took a seat in the white coach.

All went according to plan. Desdunes was committed for trial to the Criminal District Court in New Orleans and released on bail. On March 21, James C. Walker, a local attorney associated with Tourgée in the case, filed a plea protesting that his client was not guilty and attacking the constitutionality of the Jim Crow law. He wrote Tourgée that he intended to go to trial as early as he could.

Between the lawyers there was not entire agreement on procedure. Walker favored the plea that the law was void because it attempted to regulate interstate commerce, over which the Supreme Court held that Congress had exclusive jurisdiction. Tourgée was doubtful. "What we want," he wrote Walker, "is not a verdict of not guilty, nor a defect in this law but a decision whether such a law can be legally enacted and enforced in any state and we should get everything off the track and out of the way for such a decision." Walker confessed that "it's hard for me to give up my pet hobby that the law is void as a regulation of interstate commerce," and Tourgée admitted that he "may have spoken too lightly of the interstate commerce matter."

The discussion was ended abruptly and the whole approach altered before Desdunes' case came to trial by a decision of the Louisiana Supreme Court handed down on May 25. In this case, which was of entirely independent origin, the court reversed the ruling of a lower court and upheld the Pullman Company's plea that the Jim Crow law was unconstitutional in so far as it applied to interstate passengers.

Desdunes was an interstate passenger holding a ticket to Alabama, but the decision was a rather empty victory. The law still applied to intrastate passengers, and since all states adjacent to Louisiana had by this time adopted similar or identical Jim Crow laws, the exemption of interstate passengers was of no great importance to the Negroes of Louisiana, and it left the principle against which they contended unchallenged. On June i, Martinet wired Tourgée on behalf of the committee, saying that "Walker wants new case wholly within state limits," and asking Tourgée's opinion. Tourgée wired his agreement.

One week later, on June 7, Homer Adolph Plessy bought a ticket in New Orleans, boarded the East Louisiana Railroad bound for Covington, a destination "wholly within the state limits," and took a seat in the white coach. Since Plessy later described himself as "seven-eighths Caucasian and one-eighth African blood," and swore that "the admixture of colored blood is not discernible," it may be assumed that the railroad had been told of the plan and had agreed to co-operate. When Plessy refused to comply with the conductor's request that he move to the Jim Crow car, he was arrested by Detective Christopher C. Cain "and quietly accompanied the officer." The New Orleans Times-Democrat remarked that "It is generally believed that Plessy intends testing the law before the courts."

In due course Homer Plessy's case became Plessy v. Fergiison . The latter name belonged to John H. Ferguson, Judge of Section A of the Criminal District Court for the Parish of New Orleans, who overruled the plea of Tourgée and Walker, the defendant's counsel, that the Jim Crow law was null and void because it was in conflict with the Constitution of the United States. Plessy then applied to the State Supreme Court for a writ of prohibition and certiorari and was given a hearing in November, 1892. The court recognized that neither the interstate commerce clause nor the question of equality of accommodations was involved and held that "the sole question" was whether a law requiring "separate but equal accommodations" violated the Fourteenth Amendment. Citing numerous decisions of lower federal courts to the effect that accommodations did not have to be identical to be equal, the court as expected upheld the law.

"We have been at pains to expound this statute," added the court, "because the dissatisfaction felt with it by a portion of the people seems to us so unreasonable that we can account for it only on the ground of some misconception."

Chief Justice Francis Redding Tillou Nicholls, heading the court that handed down this decision in 1892, had signed the Jim Crow act as governor when it was passed in 1890. Previously he had served as the "Redeemer" governor who took over Louisiana from the carpetbaggers in 1877 and inaugurated a brief regime of conservative paternalism. In those days Nicholls had denounced race bigotry, appointed Negroes to office, and attracted many of them to his party.

L. A. Martinet wrote Tourgée that Nicholls in those years had been "fair & just to colored men" and had, in fact, "secured a degree of protection to the colored people not enjoyed under Republican Governors." But in November, 1892, the wave of Populist rebellion among the white farmers was reaching its crest in the South, and Judge Nicholls' change of course typified the concessions to racism that conservatives of his class made in their efforts to forestall or divert the rebellion. Nonetheless, at a further hearing Nicholls granted Plessy's petition for a writ of error that permitted him to seek redress before the Supreme Court of the United States.

The brief that Albion Tourgée submitted to the Supreme Court in behalf of Plessy breathed a spirit of equalitarianism that was more in tune with his carpet-bagger days than with the prevailing spirit of the midnineties.

At the very outset, he advanced an argument in behalf of his client that unconsciously illustrated the paradox that had from the start haunted the American attempt to reconcile strong color prejudice with deep equalitarian commitments.

Plessy, he contended, had been deprived of property without due process of law. The "property" in question was the "reputation of being white." It was "the most valuable sort of property, being the master-key that unlocks the golden door of opportunity." Intense race prejudice excluded any man suspected of having Negro blood "from the friendship and companionship of the white man," and therefore from the avenues to wealth, prestige, and opportunity. "Probably most white persons if given the choice," he held, "would prefer death to life in the United States as colored persons."

Since Tourgée had proposed that a person who was "nearly white" be selected for the test case, it may be presumed that he did so with this argument in mind. But this was not a defense of the colored man against discrimination by whites, but a defense of the "nearly" white man against the penalties of color. The argument, whatever its merits, apparently did not impress the Court.

Tourgée went on to develop more relevant points. He emphasized especially the incompatibility of the segregation law with the spirit and intent of the Thirteenth and particularly the Fourteenth amendments. Segregation perpetuated distinctions "of a servile character, coincident with the institution of slavery." He held that "slavery was a caste, a legal condition of subjection to the dominant class, a bondage quite separable from the incident of ownership." He scorned the pretense of impartiality and equal protection advanced in the defense of the "separate but equal" doctrine.

"The object of such a law," he declared, "is simply to debase and distinguish against the inferior race. Its purpose has been properly interpreted by the general designation of 'Jim Crow Car' law. Its object is to separate the Negroes from the whites in public conveyances for the gratification and recognition of the sentiment of white superiority and white supremacy of right and power." He asked the members of the Court to imagine the tables turned and themselves ordered into a Jim Crow car. "What humiliation, what rage would then fill the judicial mind!" he exclaimed.

The clue to the true intent of the Louisiana statute was that it did not apply "to nurses attending the children of the other race." On this clause Tourgée shrewdly observed:

The exemption of nurses shows that the real evil lies not in the color of the skin but in the relation the colored person sustains to the white. If he is a dependent it may be endured: if he is not, his presence is insufferable. Instead of being intended to promote the general comfort and moral well-being, this act is plainly and evidently intended to promote the happiness of one class by asserting its supremacy and the inferiority of another class. Justice is pictured blind and her daughter, the Law, ought at least to be color-blind.

Tourgée then asked the Court to look to the future. Should the separate-car law be upheld, he inquired, "what is to prevent the application of the same principle to other relations?" Was there any limit to such laws? "Why not require all colored people to walk on one side of the street and whites on the other?...One side of the street may be just as good as the other....The question is not as to the equality of the privileges enjoyed, but the right of the State to label one citizen as white and another as colored in the common enjoyment of a public highway."

The Supreme Court did not get around to handing down a decision on Plessy v. Ferguson until 1896. In the years that intervened between the passage of the Louisiana segregation law in July, 1890, and the time of the eventual decision on its constitutionality in 1896, the retreat from the commitment to equality had quickened its pace in the South and met with additional acquiescence, encouragement, and approval in the North. Two states had already disfranchised the Negro, and several others, including Louisiana, were planning to take the same course. In 1892 Congress defeated the Lodge Bill, designed to extend federal protection to elections, and in 1894 it wiped from the federal statute books a mass of Reconstruction laws for the protection of equal rights. And then, on September 18, 1895, Booker T. Washington delivered a famous speech embodying the so-called "Atlanta Compromise," which was widely interpreted as an acceptance of subordinate status for the Negro by the foremost leader of the race.

On May 18, 1896, Justice Henry Billings Brown, a resident of Michigan but a native of Massachusetts, delivered the opinion of the Court in the case of Plessy v. Ferguson . His views upholding the defendant's case —that the "separate but equal" doctrine was constitutional—were in accord with those of all his brothers, with the possible exception of Justice David Josiah Brewer, who did not participate, and the certain exception of Justice John Marshall Harlan, who vigorously dissented in phrases that often echoed Tourgee's arguments. In approving, to all intents and purposes, the principle of segregation, Justice Brown followed not only the trend of the times, but a host of state judicial precedents, which he cited at length. That there were no federal judicial precedents to the contrary only added to the technical strength of his position. Just as telling, perhaps, was Brown's mention of the action of Congress in establishing segregated schools for the District of Columbia, an action endorsed by Radical Republicans who had supported the Fourteenth Amendment, and sustained in regular congressional appropriations ever since.

Similar laws, wrote Brown, were adopted by "the legislatures of many states and have been generally, if not uniformly, sustained by the courts." The validity of such segregation laws, he maintained, depended on their "reasonableness." And in determining reasonableness, the legislature "is at liberty to act with reference to the established usages, customs, and traditions of the people, and with a view to the promotion of their comfort, and the preservation of the public peace and good order."

In addition to judicial precedent and accepted practice, Justice Brown ventured into the more uncertain fields of sociology and psychology for support of his opinion. He wrote:

We consider the underlying fallacy of the plaintiff's argument to consist in the assumption that the enforced separation of the two races stamps the colored race with a badge of inferiority. If this be so, it is not by reason of anything found in the act, but solely because the colored race chooses to put that construction upon it....The argument also assumes that social prejudices may be overcome by legislation, and that equal rights cannot be secured by the negro except by an enforced commingling of the two races. We cannot accept this proposition....Legislation is powerless to eradicate racial instincts, or to abolish distinctions based upon physical differences, and the attempt to do so can only result in accentuating the difficulties of the present situation. If the civil and political rights of both races be equal, one cannot be inferior to the other civilly or politically. If one race be inferior to the other socially, the constitution of the United States cannot put them upon the same plane.

One of the most fascinating paradoxes in American jurisprudence is that the opinion of a native son of Massachusetts, Brown, should have bridged the gap between the radical equalitarian commitment of 1868 and the reactionary repudiation of that commitment in 1896; and that Harlan, a southerner, should have bridged the greater gap between the repudiation of 1896 and the radical rededication to the equalitarian idealism of 1868 in 1954. For the dissenting opinion of Justice Harlan, embodying many of the arguments of Plessy's ex-carpetbagger counsel, foreshadowed the Court's eventual repudiation of the Plessy v. Ferguson decision and the doctrine of "separate but equal" more than half a century later—a repudiation in which, fit- tingly enough, Harlan's grandson and namesake on the Warren Court wholly concurred.

The elder John Marshall Harlan is correctly described by Robert Cushman as "a Southern gentleman and a slave-holder, and at heart a conservative." A Kentuckian of the Whig persuasion, Harlan had opposed secession and fought in the Union Army, but at the same time he opposed both the emancipation of the slaves and the passage of civil rights laws to protect the rights of the freedmen. Shocked by Ku Klux excesses, he experienced a sudden conversion, renounced his former views, became a Republican in 1868, and was appointed to the Supreme Court by President Hayes in 1877.

After his conversion Harlan became one of the most outspoken champions of Negro rights of his time, and during his thirty-four years on the bench he lifted his voice repeatedly against denial of those rights by the dominant opinion of the Court. His famous dissent in the Civil Rights Cases of 1883 had denounced the "subtle and ingenious verbal criticism" by which "the substance and spirit of the recent amendments of the Constitution have been sacrificed." And in 1896 he was ready to strike another blow for his adopted cause.

Harlan held the Louisiana segregation law in clear conflict with both the Thirteenth and the Fourteenth amendments. The former "not only struck down the institution of slavery," but also "any burdens or disabilities that constitute badges of slavery or servitude," and segregation was just such a burden or badge. Moreover, the Fourteenth Amendment "added greatly to the dignity and glory of American citizenship, and to the security of personal liberty," and segregation denied to Negroes the equal protection of both dignity and liberty. "The arbitrary separation of citizens, on the basis of race, while they are on a public highway," he said, "is a badge of servitude wholly inconsistent with the civil freedom and the equality before the law established by the constitution. It cannot be justified upon any legal grounds."

↑

Harlan was as scornful as Tourgée had been of the claim that the separate-car law did not discriminate against the Negro. "Every one knows," he declared, "that its purpose was "to exclude colored people from coaches occupied by or assigned to white persons." This was simply a poorly disguised means of asserting the supremacy of one class of citizens over another. The Justice continued:

But in view of the constitution, in the eye of the law, there is in this country no superior, dominant, ruling class of citizens. There is no caste here. Our constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law. The humblest is the peer of the most powerful. The law regards man as man, and takes no account of his surroundings, or of his color when his civil rights as guarantied by the supreme law of the land are involved....We boast of the freedom enjoyed by our people above all other peoples. But it is difficult to reconcile that boast with a state of law which, practically, puts the brand of servitude and degradation upon a large class of our fellow citizens,—our equals before the law. The thin disguise of "equal" accommodations for passengers in railroad coaches will not mislead any one, nor atone for the wrong this day done.

"The present decision, it may well be apprehended," predicted Harlan, "will not only stimulate aggressions, more or less brutal and irritating, upon the admitted rights of colored citizens, but will encourage the belief that it is possible, by means of state enactments, to defeat the beneficent purposes which the people of the United States had in view when they adopted the recent amendments of the constitution...." For if the state may so regulate the railroads, "why may it not so regulate the use of the streets of its cities and towns as to compel white citizens to keep on one side of a street, and black citizens to keep on the other," or, for that matter, apply the same regulations to streetcars and other vehicles, or to courtroom, the jury box, the legislative hall, or to any other place of public assembly?

"In my opinion," the Kentuckian concluded, "the judgment this day rendered will, in time, prove to be quite as pernicious as the decision made by this tribunal in the Dred Scott Case."

But Harlan was without allies on the Court, and the country as a whole received the news of its momentous decision upholding the "separate but equal" doctrine in relative silence and apparent indifference. Thirteen years earlier the Civil Rights Cases had precipitated pages of news reports, hundreds of editorials, indignant rallies, congressional bills, a Senate report, and much general debate. In striking contrast, the Plessy decision was accorded only short, inconspicuous news reports and virtually no editorial comment outside the Negro press. A great change had taken place, and the Court evidently now gave voice to the dominant mood of the country. Justice Harlan had spoken for the forgotten convictions of a bygone era.

The racial aggressions he foresaw came in a flood after the decision of 1896. Even Harlan indicated by his opinion of 1899 in Cummings v. Board of Education that he saw nothing unconstitutional in segregated public schools. Virginia was the last state in the South to adopt the separate-car law, and she resisted it only until 1900. Up to that year this was the only law of the type adopted by a majority of the southern states. But on January 12, 1900, the editor of the Richmond Times was in full accord with the new spirit when he asserted: "It is necessary that this principle be applied in every relation of Southern life. God Almighty drew the color line and it cannot be obliterated. The negro must stay on his side of the line and the white man must stay on his side, and the sooner both races recognize this fact and accept it, the better it will be for both."

With a thoroughness approaching the incredible, the color line was drawn and the Jim Crow principle was applied even in those areas that Tourgée and Harlan had suggested a few years before as absurd extremes. In sustaining all these new laws, courts universally and confidently cited Plessy v. Ferguson as their authority. They continued to do so for more than half a century.

On April 4, 1950, Justice Robert H. Jackson wrote old friends in Jamestown, New York, of his surprise in running across the name of Albion W. Tourgée, once a resident of the nearby village of Mayville, in connection with segregation decisions then pending before the Supreme Court. "The Plessy case arose in Louisiana," he wrote, "and how Tourgée got into it I have not learned. In any event, I have gone to his old brief, filed here, and there is no argument made today that he would not make to the Court. He says, 'Justice is pictured blind and her daughter, the Law, ought at least to be color-

blind.' Whether this was original with him, it has been gotten off a number of times since as original wit. Tourgée's brief was filed April 6, 1896 and now, just fifty-four years after, the question is again being argued whether his position will be adopted and what was a defeat for him in '96 be a postmortem victory."

Plessy v. Ferguson remained the law of the land for fifty-eight years lacking one day, from May 18, 1896, to May 17, 1954, when the Supreme Court at last renounced it in the school segregation cases of Brown et al. v. Board of Education of Topeka , et al. In that decision could indeed be found, at long last, a vindication, "a post-mortem victory"—not only for the excarpetbagger Tourgée, but for the ex-slaveholder Harlan as well.

« 1 2 3 4 5 6 »

View full article

#Plessy v Ferguson (/category/article-keywords/plessy-v-ferguson)

#Segregation (/category/article-keywords/segregation)

#African-American History (/category/article-keywords/african-american-history)

ource=americanheritage&utm_medium=referral&utm_content=thumbnails-a:Below Article Thumbnails:)
ource=americanheritage&utm_medium=referral&utm_content=thumbnails-a:Below Article Thumbnails:)

You May Like

(https://www.giveitlove.com/a-couple-gave-birth-to-beautiful-twins-see-where-they-are-now/?utm_source=tb&utm_medium=americanheritage-tb&utm_content=2979093570&utm_campaign=9132142-tb&utm_cpc=0.224)

**These Twins Were Named "Most Beautiful In The World," Wait Until You See Them Today**

Give It Love

(https://www.giveitlove.com/a-couple-gave-birth-to-beautiful-twins-see-where-they-are-now/?utm_source=tb&utm_medium=americanheritage-tb&utm_content=2979093570&utm_campaign=9132142-tb&utm_cpc=0.224)

(https://www.gamedaynews.com/trending/salaries-sports-analysts/?utm_source=tb&utm_medium=americanheritage-tb&utm_content=2961163116&utm_campaign=8084701-tb&utm_cpc=0.192)

**Sportscasters Salaries Finally Released**

Gameday News

(https://www.gamedaynews.com/trending/salaries-sports-analysts/?utm_source=tb&utm_medium=americanheritage-tb&utm_content=2961163116&utm_campaign=8084701-tb&utm_cpc=0.192)

(https://moneywise.com/a/ch-b/the-worst-states-for-retirement-in-2020?t=Avoid%20These%2016%20US%20States%20When%20You%20Retire&utm_campaign=4776605&utm_source=taboola&utm_medium=Desktop&utm_term=rm_w3&hero=20200505141647040012014334078s_trn_d=0.1476&tblci=GiBAX1cRmh4vXZfMXStqtJhYpJ9jgu5xZ_Wb40ZTf3cNLSCcmU8ot_re46-rm_w3)

**Avoid These 16 US States When You Retire**

MoneyWise.com

(https://moneywise.com/a/ch-b/the-worst-states-for-retirement-in-2020?t=Avoid%20These%2016%20US%20States%20When%20You%20Retire&utm_campaign=4776605&utm_source=taboola&utm_medium=Desktop&utm_term=rm_w3&hero=20200505141647040012014334078s_trn_d=0.1476&tblci=GiBAX1cRmh4vXZfMXStqtJhYpJ9jgu5xZ_Wb40ZTf3cNLSCcmU8ot_re46-rm_w3)

(https://bridesblush.com/trends/prince-harry-sister-tb-3/?prch=9cc1f14ad2a7cbd03dce7ba0c2be843b&utm_campaign=Royal%20Sister%20MBS%20Gabriala1001%20SB%20En%20-%20%20Desktop%20USA&utm_source=taboola&utm_medium=americanheritage&utm_term=This+Is+Why+The+Royal+Family+Kept+Quiet+About+Prince+H a373-4fc1-81da-d51753c5ae24.png&psl=g_00a250&c=0.062)

**This Is Why The Royal Family Kept Quiet About Prince Harry's Sister**

# EXHIBIT (8)

medRxiv preprint doi: https://doi.org/10.1101/2021.06.01.21258176; this version posted June 5, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC-ND 4.0 International license .

# Necessity of COVID-19 vaccination in previously infected individuals

Nabin K. Shrestha,[1] Patrick C. Burke,[2] Amy S. Nowacki,[3] Paul Terpeluk,[4] Steven M. Gordon[1]

From the Departments of [1]Infectious Diseases, [2]Infection Prevention, [3]Quantitative Health Sciences, and [4]Occupational Health, Cleveland Clinic, Cleveland, Ohio.

**Keywords:** SARS-CoV-2; COVID-19; Incidence; Vaccines; Immunity;

**Running Title:** COVID-19 vaccination if already infected

**Corresponding author:**

Nabin K. Shrestha, MD, MPH

9500 Euclid Avenue / G-21

Cleveland, OH 44195

Phone: 216-636-1873 / Fax: 216-445-9446 / Email: shrestn@ccf.org

**Summary:** Cumulative incidence of COVID-19 was examined among 52238 employees in an American healthcare system. COVID-19 did not occur in anyone over the five months of the study among 2579 individuals previously infected with COVID-19, including 1359 who did not take the vaccine.

1

NOTE: This preprint reports new research that has not been certified by peer review and should not be used to guide clinical practice.

medRxiv preprint doi: https://doi.org/10.1101/2021.06.01.21258176; this version posted June 5, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC-ND 4.0 International license .

# ABSTRACT

***Background.*** The purpose of this study was to evaluate the necessity of COVID-19 vaccination in persons previously infected with SARS-CoV-2.

***Methods.*** Employees of the Cleveland Clinic Health System working in Ohio on Dec 16, 2020, the day COVID-19 vaccination was started, were included. Any subject who tested positive for SARS-CoV-2 at least 42 days earlier was considered previously infected. One was considered vaccinated 14 days after receipt of the second dose of a SARS-CoV-2 mRNA vaccine. The cumulative incidence of SARS-CoV-2 infection over the next five months, among previously infected subjects who received the vaccine, was compared with those of previously infected subjects who remained unvaccinated, previously uninfected subjects who received the vaccine, and previously uninfected subjects who remained unvaccinated.

***Results.*** Among the 52238 included employees, 1359 (53%) of 2579 previously infected subjects remained unvaccinated, compared with 22777 (41%) of 49659 not previously infected. The cumulative incidence of SARS-CoV-2 infection remained almost zero among previously infected unvaccinated subjects, previously infected subjects who were vaccinated, and previously uninfected subjects who were vaccinated, compared with a steady increase in cumulative incidence among previously uninfected subjects who remained unvaccinated. Not one of the 1359 previously infected subjects who remained unvaccinated had a SARS-CoV-2 infection over the duration of the study. In a Cox proportional hazards regression model, after adjusting for the phase of the epidemic, vaccination was associated with a significantly lower risk of SARS-CoV-2 infection among those not previously infected (HR 0.031, 95% CI 0.015 to 0.061) but not among those previously infected (HR 0.313, 95% CI 0 to Infinity).

***Conclusions.*** Individuals who have had SARS-CoV-2 infection are unlikely to benefit from COVID-19 vaccination, and vaccines can be safely prioritized to those who have not been infected before.

medRxiv preprint doi: https://doi.org/10.1101/2021.06.01.21258176; this version posted June 5, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC-ND 4.0 International license .

## INTRODUCTION

The two FDA-approved (BNT162b2 mRNA [Pfizer-BioNTech] and mRNA-1273 [Moderna]) mRNA vaccines have been shown to be very efficacious in protecting against Severe Acute Respiratory Syndrome (SARS) – associated Coronavirus-2 (SARS-CoV-2) infection [1,2]. The effectiveness of the Pfizer-BioNTech vaccine in a real-world setting has also been shown to be comparable to the efficacy demonstrated in clinical trials [3,4]. Given these, there has been an understandable desire to vaccinate as many people as possible.

The ability to vaccinate a large part of the population is limited by the supply of vaccine. As of March 21, 2021, 78% of 447 million doses of the coronavirus disease 2019 (COVID-19) vaccines that had been deployed had gone to only ten countries [5]. The COVAX initiative was borne out of the recognition that equitable distribution of vaccines worldwide was essential for effective control of the COVID-19 pandemic. However, the reality is that there is great disparity in the availability of vaccines across countries. Countries with limited supplies of vaccine have to prioritize how their supply of vaccines will be allocated within their populations. Criteria used for such prioritization have included profession, age, and comorbid conditions. Data that inform prioritization criteria with help maximize the benefits of whatever vaccine is available.

Observational studies have found very low rates of reinfection among individuals with prior SARS-CoV-2 infection [6–8]. This brings up the question about whether it is necessary to vaccinate previously infected individuals. These studies notwithstanding, there remains a theoretical possibility that the vaccine may still provide some benefit in previously infected persons. A prior large observational study concluded that immunity from natural infection cannot be relied on to provide adequate protection and advocated for vaccination of previously infected individuals [9]. The CDC website recommends that persons previously infected with SARS-CoV-2 still get the vaccine [10]. Despite these recommendations, credible reports of previously infected persons getting COVID-19 are rare. The rationale often provided for getting the COVID-19 vaccine is that it is safer to get vaccinated than to get the disease. This is

3

medRxiv preprint doi: https://doi.org/10.1101/2021.06.01.21258176; this version posted June 5, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC-ND 4.0 International license.

certainly true, but it is not an explanation for why people who have already had the disease need to be vaccinated. A strong case for vaccinating previously infected persons can be made if it can be shown that previously infected persons who are vaccinated have a lower incidence of COVID-19 than previously infected persons who did not receive the vaccine.

The purpose of this study was to attempt to do just that, and thereby evaluate the necessity of the COVID-19 vaccine in persons who were previously infected with SARS-CoV-2.

medRxiv preprint doi: https://doi.org/10.1101/2021.06.01.21258176; this version posted June 5, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC-ND 4.0 International license.

## METHODS

### Study design

This was a retrospective cohort study conducted at the Cleveland Clinic Health System in Ohio, USA. The study was approved by the Cleveland Clinic Institutional Review Board. A waiver of informed consent and waiver of HIPAA authorization were approved to allow access to personal health information by the research team, with the understanding that sharing or releasing identifiable data to anyone other than the study team was not permitted without additional IRB approval.

### Setting

PCR testing for SARS-CoV-2 at Cleveland Clinic began on March 12, 2020, and a streamlined process dedicated to the testing of health care personnel (HCP) was begun shortly thereafter. All employees with a positive SARS-CoV-2 test were interviewed by Occupational Health, with date of onset of symptoms of COVID-19 being one of the questions asked. Vaccination for COVID-19 began at Cleveland Clinic on December 16, 2020. When initially started it was the Pfizer-BioNTech vaccine that was administered, until the Moderna vaccine became available, from which time employees received one or the other. All employees were scheduled to receive their second vaccine dose 28 days after the first one, regardless of which vaccine was given. The employee cohort was chosen for this study because of documentation of their COVID-19 vaccination and of any SARS-CoV-2 infection in the Occupational Health database.

### Participants

All employees of the Cleveland Clinic Health System, working in Ohio, on Dec 16, 2020, were screened for inclusion in the study. Those who were in employment on December 16, 2020, were included.

5

medRxiv preprint doi: https://doi.org/10.1101/2021.06.01.21258176; this version posted June 5, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC-ND 4.0 International license.

## Variables

SARS-CoV-2 infection was defined as a positive nucleic acid amplification test. The date of infection was taken to be the date of onset of symptoms when available, and the date of specimen collection when not. A person was considered vaccinated 14 days after receipt of the second dose of the vaccine (which would have been 42 days after receipt of the first dose of the vaccine for most subjects). For the sake of consistency in the duration assumed for development of natural and vaccine immunity, any person who tested positive for SARS-CoV-2 at least 42 days before the vaccine rollout date, was considered previously infected. Other covariates collected were age, job location, job type (patient-facing or non-patient facing), and job category. The job location variable could be one of the following: Cleveland Clinic Main Campus, regional hospital (within Ohio), ambulatory center, administrative center, or remote location. The job category was one of the following: professional staff, residents/fellows, advance practice practitioners, nursing, pharmacy, clinical support, research, administration, and administration support.

## Outcome

The study outcome was time to SARS-CoV-2 infection, the latter defined as a positive nucleic acid amplification test for SARS-CoV-2 on or after December 16, 2020. Time to SARS-CoV-2 infection was calculated as number of days from December 16, 2020 (vaccine rollout date) to SARS-CoV-2 infection. Employees that had not developed a SARS-CoV-2 infection were censored at the end of the study follow-up period (May 15, 2021). Those who received the Johnson & Johnson vaccine (81 subjects) without having had a SARS-CoV-2 infection were censored on the day of receipt of the vaccine, and those whose employment was terminated during the study period before they had SARS-CoV-2 infection (2245 subjects) were censored on the date of termination of employment. The health system never had a requirement for asymptomatic employee test screening. Most of the positive tests, therefore, would have

6

medRxiv preprint doi: https://doi.org/10.1101/2021.06.01.21258176; this version posted June 5, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC-ND 4.0 International license .

been tests done to evaluate suspicious symptoms. A small proportion would have been tests done as part of pre-operative or pre-procedural screening.

## Statistical analysis

A Simon-Makuch hazard plot [11] was created to compare the cumulative incidence of SARS-CoV-2 infection among previously infected subjects who were vaccinated, with those of previously infected subjects who remained unvaccinated, previously uninfected subjects who were vaccinated, and previously uninfected subjects who remained unvaccinated. Previous infection was treated as a time-independent covariate (SARS-CoV-2 infection at least 42 days before Dec 16, 2020), and vaccination (14 days after receipt of the second dose of the vaccine) was treated as a time-dependent covariate (Figure 1). Curves for the unvaccinated were based on data for those who did not receive the vaccine over the duration of the study, and for those who did until the date they were considered vaccinated, from which point onwards their data were recorded into the corresponding vaccinated set. A Cox proportional hazards regression model was fitted with time to SARS-CoV-2 infection as the outcome variable against vaccination (as a time-dependent covariate whose value changed on the date a subject was considered vaccinated)[12]. Previous infection (as a time-independent covariate) and an interaction term for previous infection and vaccination were included as covariates. The phase of the epidemic was adjusted for by including the slope of the epidemic curve as a time-dependent covariate whose value changed continuously with the slope of the epidemic curve. The analysis was performed by NKS and ASN using the *survival* package and R version 4.0.5 [12–14].

medRxiv preprint doi: https://doi.org/10.1101/2021.06.01.21258176; this version posted June 5, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC-ND 4.0 International license.

## RESULTS

Of 52238 employees included in the study, 2579 (5%) were previously infected with SARS-CoV-2.

### Baseline characteristics

Those previously infected with SARS-CoV-2 were significantly younger (mean ± SD age; 39 ± 13 vs. 42 ± 13, p<0.001), and included a significantly higher proportion with patient-facing jobs (65% vs. 51%, p<0.001). Table 1 shows the characteristics of subjects grouped by whether or not they were previously infected. A significantly lower proportion of those previously infected (47%, 1220 subjects) were vaccinated by the end of the study compared to 59% (29461) of those not previously infected (p<0.001). Of those vaccinated, 63% received the Moderna vaccine. Twelve percent of subjects with previous SARS-CoV-2 infection did not have a symptom onset date, suggesting they may possibly have been identified on pre-operative or pre-procedural screening, and may not have had symptomatic infection. When vaccination was begun, the epidemic in Ohio was at the peak of its third wave (Figure 2).

### Cumulative incidence of COVID-19

Figure 3 is a Simon-Makuch plot showing that SARS-CoV-2 infections occurred almost exclusively in subjects who were not previously infected with SARS-CoV-2 and who remained unvaccinated. The cumulative incidence of SARS-CoV-2 infection among previously infected unvaccinated subjects did not differ from that of previously infected subjects who were vaccinated, and that of previously uninfected subjects who were vaccinated. For all three of these groups, the cumulative incidence of SARS-CoV-2 infection was much lower than that of subjects who were not previously infected and who remained unvaccinated. Of the 2154 SARS-CoV-2 infections during the study period, 2139 (99.3%) occurred among those not previously infected who remained unvaccinated or were waiting

8

medRxiv preprint doi: https://doi.org/10.1101/2021.06.01.21258176; this version posted June 5, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC-ND 4.0 International license .

to get vaccinated, and 15 (0.7%) occurred among those not previously infected who were vaccinated. Not one of the 2579 previously infected subjects had a SARS-CoV-2 infection, including 1359 who remained unvaccinated throughout the duration of the study.

## Association of vaccination with occurrence of COVID-19

In a Cox proportional hazards regression model, after adjusting for the phase of the epidemic, vaccination was associated with a significantly lower risk of SARS-CoV-2 infection among those not previously infected (HR 0.031, 95% CI 0.015 – 0.061) but not among those previously infected (HR 0.313, 95% CI 0 – Infinity). The absence of events among those who were previously infected, whether they received the vaccine or not, precluded accurate or precise estimates for the latter effect size.

## Duration of protection

This study was not specifically designed to determine the duration of protection afforded by natural infection, but for the previously infected subjects the median duration since prior infection was 143 days (IQR 76 – 179 days), and no one had SARS-CoV-2 infection over the following five months, suggesting that SARS-CoV-2 infection may provide protection against reinfection for 10 months or longer.

medRxiv preprint doi: https://doi.org/10.1101/2021.06.01.21258176; this version posted June 5, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC-ND 4.0 International license.

## DISCUSSION

This study shows that subjects previously infected with SARS-CoV-2 are unlikely to get COVID-19 reinfection whether or not they receive the vaccine. This finding calls into question the necessity to vaccinate those who have already had SARS-CoV-2 infection.

It is reasonable to expect that immunity acquired by natural infection provides effective protection against future infection with SARS-CoV-2. Observational studies have indeed found very low rates of reinfection over the following months among survivors of COVID-19 [6–8]. Reports of true reinfections are extremely rare in the absence of emergence of new variants. When such reinfections occur, it would be purely speculative to suggest that a vaccine might have prevented them. Duration of protective immunity from natural infection is not known. However, the same also can be said about duration of protective immunity from vaccination. Uncertainty about the duration of protective immunity afforded by natural infection is not by itself a valid argument for vaccinating previously infected individuals. This study provides direct evidence that vaccination with the best available vaccines does not provide additional protection in previously infected individuals.

A prior study concluded that natural infection cannot be relied on to protect against COVID-19 [9]. That study was based on comparison of PCR-positivity rates during a second COVID-19 surge in Denmark between those who tested positive and negative during the first COVID-19 surge, and indirectly calculated that prior infection provided 80.5% protection against repeat infection, and that protection against those older than 65 years was only 47.1%. The study did not compare vaccinated and unvaccinated people, and it is therefore an assumption to consider that a vaccine would have provided better protection in that particular population. Furthermore, there was a gap of only seven weeks between the end of the first surge and the beginning of the second in that study. It is now well-known that a small number of people can continue to have positive PCR test results for several weeks to a few months after infection, one study finding that 5.3% remained positive at 90 days [15]. It is possible that some of the positives picked up in the early part of the second surge were not necessarily new infections but residual

10

medRxiv preprint doi: https://doi.org/10.1101/2021.06.01.21258176; this version posted June 5, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC-ND 4.0 International license.

virus from the tail end of the first surge. Since the actual number of infections was small, a few such misclassifications could change the rates substantially. Our study examined rates of SARS-CoV-2 infection in vaccinated and unvaccinated individuals and showed that those previously infected who did not receive the vaccine did not have higher rates of SARS-CoV-2 infection than those previously infected who did, thereby providing direct evidence that vaccination does not add protection to those who were previously infected.

There are several strengths to our study. Its large sample size and follow-up of up to 5 months provide us with an ample degree of confidence in its findings. A major strength of our study is that we adjusted the analyses for the phase of the epidemic at all time points. The risk of acquisition of infection is strongly influenced by the phase of the epidemic at any given time, and it is important to adjust for this for accurate risk analyses. Given that was this a study among employees of a health system, and that the health system had policies and procedures in recognition of the critical importance of keeping track of the pandemic among its employees, we had an accurate accounting of who had COVID-19, when they were diagnosed with COVID-19, who received a COVID-19 vaccine, and when they received it.

The study has its limitations. Because we did not have a policy of asymptomatic employee screening, previously infected subjects who remained asymptomatic might have been misclassified as previously uninfected. Given this limitation, one should be cautious about drawing conclusions about the protective effect of prior asymptomatic SARS-CoV-2 infection. It should be noted though, that 12% of the subjects classified as previously infected did not have a symptom onset date recorded, suggesting that at least some of those classified as previously infected might have been asymptomatic infections. It is reassuring that none of these possibly asymptomatically infected individuals developed COVID-19 during the duration of the study. The study follow-up duration was short, being only five months, but this was longer than published mRNA vaccine efficacy studies [1,2], and longer than the follow-up duration of the largest published vaccine effectiveness studies to date [3,4]. Median freedom from reinfection (time from initial infection until end of follow-up) in this study, for those previously infected, of almost 10 months, is consistent with findings in an earlier study that immunoglobulin G (IgG) to the spike protein remained

11

medRxiv preprint doi: https://doi.org/10.1101/2021.06.01.21258176; this version posted June 5, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC-ND 4.0 International license.

stable over more than six months after an episode of infection [16]. Our study included no children and few elderly subjects, and the majority would not have been immunosuppressed. Data governance policies in our institution precluded us from obtaining detailed clinical information on employees. While one cannot generalize this study's findings to assume that prior infection would provide adequate immunity in these groups, there is also no reason to expect a vaccine to provide additional protection in these same groups. Lastly, it is necessary to emphasize that these findings are based on the prevailing assortment of virus variants in the community during the study. It is not known how well these results will hold if or when some of the newer variants of concern become prominent. However, if prior infection does not afford protection against some of the newer variants of concern, there is little reason to suppose that the currently available vaccines would either. Vaccine breakthrough infections with variants have indeed been reported [17].

Our study's findings have important implications. Worldwide, COVID-19 vaccines are still in short supply. As of March 9, 2021, dozens of countries had not been able to administer a single dose of the vaccine [18]. As of May 17, 2021, only 17 countries had been able to reach ten percent or more of their populations with at least the first dose of vaccine [19]. Given such a scarcity of the vaccine, and the knowledge that vaccine does not provide additional protection to those previously infected, it would make most sense to limit vaccine administration to those who have not previously had the infection. In addition to profession, age, and comorbid conditions, previous infection should be an important consideration in deciding whom to prioritize to receive the vaccine. A practical and useful message would be to consider symptomatic COVID-19 to be as good as having received a vaccine, and that people who have had COVID-19 confirmed by a reliable laboratory test do not need the vaccine.

In conclusion, individuals who have laboratory-confirmed symptomatic SARS-CoV-2 infection are unlikely to benefit from COVID-19 vaccination, and vaccines can be safely prioritized to those who have not been infected before.

12

medRxiv preprint doi: https://doi.org/10.1101/2021.06.01.21258176; this version posted June 5, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC-ND 4.0 International license .

## TRANSPARENCY DECLARATION

### Conflict of Interest

Selection of "no competing interests" reflects that all authors have completed the ICMJE uniform disclosure form at www.icmje.org/coi_disclosure.pdf and declare: no support from any organization for the submitted work; no financial relationships with any organizations that might have an interest in the submitted work in the previous three years; no other relationships or activities that could appear to have influenced the submitted work.

### Funding

None received.

### Author contributions

NKS: Conceptualization, Methodology, Validation, Investigation, Data curation, Software, Formal analysis, Visualization, Writing- Original draft preparation, Writing- Reviewing and Editing, Supervision, Project administration.

ASN: Methodology, Formal analysis, Visualization, Validation, Writing- Reviewing and Editing.

PCB: Resources, Investigation, Validation, Writing- Reviewing and Editing.

PT: Resources, Writing- Reviewing and Editing.

SMG: Project administration, Resources, Writing- Reviewing and Editing.

medRxiv preprint doi: https://doi.org/10.1101/2021.06.01.21258176; this version posted June 5, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC-ND 4.0 International license.

# REFERENCES

1.  Polack FP, Thomas SJ, Kitchin N, et al. Safety and Efficacy of the BNT162b2 mRNA Covid-19 Vaccine. N Engl J Med **2020**;383:2603–15.

2.  Baden LR, El Sahly HM, Essink B, et al. Efficacy and Safety of the mRNA-1273 SARS-CoV-2 Vaccine. N Engl J Med **2021**;384:403–16.

3.  Dagan N, Barda N, Kepten E, et al. BNT162b2 mRNA Covid-19 Vaccine in a Nationwide Mass Vaccination Setting. N Engl J Med **2021**;384:1412–23.

4.  Haas EJ, Angulo FJ, McLaughlin JM, et al. Impact and effectiveness of mRNA BNT162b2 vaccine against SARS-CoV-2 infections and COVID-19 cases, hospitalisations, and deaths following a nationwide vaccination campaign in Israel: an observational study using national surveillance data. Lancet **2021**;397:1819–29.

5.  Beyrer C, Allotey P, Amon JJ, et al. Human rights and fair access to COVID-19 vaccines: the International AIDS Society–Lancet Commission on Health and Human Rights. Lancet **2021**;397:1524–7.

6.  Sheehan MM, Reddy AJ, Rothberg MB. Reinfection Rates Among Patients Who Previously Tested Positive for Coronavirus Disease 2019: A Retrospective Cohort Study. Clin Infect Dis **2021**. Available from: https://doi.org/10.1093/cid/ciab234. Accessed May 5, 2021.

7.  Pilz S, Chakeri A, Ioannidis JP, et al. SARS-CoV-2 re-infection risk in Austria. Eur J Clin Invest **2021**;51:e13520.

8.  Lumley SF, O'Donnell D, Stoesser NE, et al. Antibody Status and Incidence of SARS-CoV-2 Infection in Health Care Workers. N Engl J Med **2021**;384:533–40.

9.  Hansen CH, Michlmayr D, Gubbels SM, Mølbak K, Ethelberg S. Assessment of protection against reinfection with SARS-CoV-2 among 4 million PCR-tested individuals in Denmark in 2020: a population-level observational study. Lancet **2021**;397:1204–12.

10. Centers for Disease Control and Prevention. Frequently Asked Questions about COVID-19

14

medRxiv preprint doi: https://doi.org/10.1101/2021.06.01.21258176; this version posted June 5, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC-ND 4.0 International license.

Vaccination. **2021**;Available from: https://www.cdc.gov/coronavirus/2019-ncov/vaccines/faq.html. Accessed April 26, 2021.

11. Simon R, Makuch RW. A non-parametric graphical representation of the relationship between survival and the occurrence of an event: Application to responder versus non-responder bias. Stat Med **1984;**3:35–44.

12. Therneau TM, Crowson C, Atkinson E. Using Time Dependent Covariates and Time Dependent Coefficients in the Cox Model. Available from: https://cran.r-project.org/web/packages/survival/vignettes/timedep.pdf. Accessed May 8, 2021.

13. Therneau TM, Grambsh, PM. Modeling Survival Data: Extending the Cox Model. New York, NY: Springer International Publishing; 2000.

14. R Core Team. R: A Language and Environment for Statistical Computing. Vienna, Austria: R Foundation for Statisical Computing; 2021.

15. Vibholm LK, Nielsen SSF, Pahus MH, et al. SARS-CoV-2 persistence is associated with antigen-specific CD8 T-cell responses. EBioMedicine **2021**;64:103230.

16. Dan JM, Mateus J, Kato Y, et al. Immunological memory to SARS-CoV-2 assessed for up to 8 months after infection. Science **2021**;371:eabf4063.https://doi.org/10.1126/science.abf4063.

17. Hacisuleyman E, Hale C, Saito Y, et al. Vaccine Breakthrough Infections with SARS-CoV-2 Variants. N Engl J Med **2021**; https://doi.org/10.1056/NEJMoa2105000.

18. The Lancet. Access to COVID-19 vaccines: looking beyond COVAX. Lancet **2021**;397:941.

19. Mathieu E, Ritchie H, Ortiz-Ospina E, et al. A global database of COVID-19 vaccinations. Nat Hum Behav **2021**;https://doi.org/10.1038/s41562-021-01122-8.

medRxiv preprint doi: https://doi.org/10.1101/2021.06.01.21258176; this version posted June 5, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC-ND 4.0 International license.

## TABLES

### Table 1. Study Subject Characteristics

| Characteristic | Previously Infected (N = 2579) | Not Previously Infected (N = 49659) | *P* Value |
|---|---|---|---|
| **Age, y, mean ± SD** | 39±13 | 42±13 | <0.001 |
| **Patient-facing job** | 1676 (65) | 25504 (51) | <0.001 |
| **Job location** | | | <0.001 |
| **Cleveland Clinic Main Campus** | 1011 (39) | 19595 (40) | |
| **Regional hospitals** | 1096 (43) | 16433 (33) | |
| **Ambulatory centers** | 313 (12) | 7767 (16) | |
| **Administrative centers** | 138 (5) | 4424 (9) | |
| **Remote location** | 21 (<1) | 1440 (3) | |
| **Job category** | | | <0.001 |
| **Professional staff** | 89 (4) | 3775 (8) | |
| **Residents and fellows** | 72 (3) | 1669 (3) | |
| **Advanced practice practitioners** | 154 (6) | 2806 (6) | |
| **Nursing** | 1142 (44) | 13623 (27) | |
| **Pharmacy** | 44 (2) | 1274 (3) | |
| **Research** | 328 (13) | 6776 (14) | |
| **Clinical support** | 111 (4) | 3500 (7) | |
| **Administration** | 614 (24) | 15050(30) | |
| **Administration support** | 25 (1) | 1186 (2) | |

Data are presented as no. (%) unless otherwise indicated

16

medRxiv preprint doi: https://doi.org/10.1101/2021.06.01.21258176; this version posted June 5, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC-ND 4.0 International license.

# FIGURES



**Figure 1. Explanation of "previously infected" analyzed as a time-independent covariate and "vaccinated" treated as a time-dependent covariate.**

medRxiv preprint doi: https://doi.org/10.1101/2021.06.01.21258176; this version posted June 5, 2021. The copyright holder for this preprint
(which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC-ND 4.0 International license.



**Figure 2. COVID-19 epidemic curve before and after vaccine rollout.** Points on the scatter plot

represent the proportion of all COVID-19 PCR tests done at Cleveland Clinic that were positive on any

given day. The colored line represents a fitted polynomial curve.

medRxiv preprint doi: https://doi.org/10.1101/2021.06.01.21258176; this version posted June 5, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC-ND 4.0 International license.



**Figure 3. Simon-Makuch plot showing the cumulative incidence of COVID-19 among subjects previously infected and not previously infected with COVID-19, who did and did not receive the vaccine.** Curves for the unvaccinated are based on data for those who did not receive the vaccine during the duration of the study, and for those waiting to receive the vaccine. Day zero was Dec 16, 2020, the day vaccination was started in our institution. Error bars represent 95% confidence intervals. Seven subjects who had been vaccinated earlier as participants in clinical trials were considered vaccinated throughout the duration of the study. Twelve subjects who received their first dose in the first week of the vaccination campaign managed to get their second dose three weeks later, and were thus considered vaccinated earlier than 42 days since the start of the vaccination campaign.